[Civil No. 1262.   Filed March 20, 1913.]

[130 Pac. 887.]

# C. W. RUSE, W. K. RUSE, MARY M. RUSE, W. E. HUR-LEY, ESTELLA HURLEY, ELIZA RUSE and CHARLES HUMMONS, Appellants, v. HIRAM WILL-IAMS, Appellee.

1. ASSUMPSIT, ACTION OF—"GENERAL ASSUMPSIT"—"INDEBITATUS AS-SUMPSIT"—BURDEN OF PROOF.—General or *indebitatus assumpsit* is an action brought on a promise or contract implied in law that the defendant, in equity and in good conscience, is bound to pay plaintiff the consideration of a benefit conferred; the burden being on plaintiff to show, not only that plaintiff has conferred a benefit on defendant, but that defendant, in equity and in good conscience, is bound to pay therefor.

2. RELIGIOUS SOCIETIES — PROPERTY — CONTRIBUTIONS—WITHDRAWAL OF MEMBER—RIGHT TO RECOVER CONTRIBUTIONS—ASSUMPSIT.—Where plaintiff joined a religious sect holding the community theory of ownership of property as one of its doctrines, and in accordance therewith plaintiff contributed all his property to the community on the understanding that he and his family should receive support in the future from the common fund, plaintiff, on subsequently with-drawing from the society, could not recover the value of the prop-erty so contributed in *assumpsit;* the facts being insufficient to show that defendants had property of plaintiff which, in equity and in good conscience, they ought not to keep.

3. RELIGIOUS SOCIETIES—"ASSOCIATION"—The term "association" is a word of vague meaning used to indicate a collection of persons who have joined together for a certain object; and an aggregation of people joined together for the purpose of effectuating certain ideals of religious life, including the communistic ownership of property, may properly be included within the term.

APPEAL from a judgment of the Superior Court of the County of Yuma. Frank Baxter, Judge. Reversed, with in-structions to dismiss.

The facts are stated in the opinion.

Mr. Peter T. Robertson, for Appellants.

Messrs. Timmons & Harris, for Appellee.

FRANKLIN, C. J.—This is an action of *assumpsit* brought by the plaintiff, in two counts, against the defendants on an alleged joint and several liability for cash, goods, wares and merchandise furnished and advanced by plaintiff and his assignor, one A. G. Kurvess. In the first paragraph of the complaint the allegation is made that the defendants and each of them are transient persons in a roving band without residence, but at present domiciled in Yuma county.

A judgment on a joint and several liability of the defendants to plaintiff was entered for $1,600, interest and costs. The appeal is prosecuted from the judgment and from the order overruling the defendants' motion for a new trial. A consideration of appellants' assignment questioning the sufficiency of the evidence to support the judgment is determinative of the case.

General *assumpsit* or *indebitatus assumpsit* is an action of *assumpsit* brought upon the promise or contract implied by law in certain cases. It is founded upon what the law terms an implied promise on the part of the defendant to pay what, in good conscience, he is bound to pay to the plaintiff; and the burden is upon the plaintiff to show that the defendant *ex aequo et bono* is bound to pay. Where the case shows that it is the duty of the defendant to pay, the law implies a promise to fulfill that obligation; but the law never implies a promise to pay, unless some duty creates such an obligation. *Bailey* v. *Railroad Co.,* 22 Wall. (U. S.) 604, 22 L. Ed. 840.

There was no evidence offered by defendants, but a fair inference drawn from the evidence in behalf of plaintiff discloses that he and his assignor, A. G. Kurvess, together with the defendants and others to the number of about twenty-nine persons, formed themselves into a voluntary association, unincorporated, calling themselves as thus associated a "Spiritual Class." The term "association" is a word of vague meaning used to indicate a collection of persons who have joined together for a certain object, and the Spiritual Class thus formed may properly be included within the meaning of the terms as so defined.

The object of the Spiritual Class was to aid in effectuating certain ideals in religious life, especially those relating to the communistic ownership of property. Their aim was to live such a life as Christ lived, and the mode of life described in

the Acts of the Apostles was the foundation stone upon which was to be erected the arch of a high ideal in religious belief. Before joining the Spiritual Class, each person passed a "novitiate," as it were, and before being formally considered a member in good standing was subjected to rather a rigid examination as to his fitness. It may be stated in the words of a witness: "We were asked if we were willing to give up all for the Lord, and were referred to the fourth and fifth chapters of Acts to read; and, of course, we said we were willing to give up all and spend our time for the benefit of saving souls and for the benefit of the Lord. . . . We were supposed to live as one family, and when one needed anything, whether they put anything in the treasury or not, they were to have it." The class was formed in Findlay, Ohio, some time about February, 1911, and its membership consisted of persons who had hitherto been acquainted with each other for some time.

When the plaintiff joined, he gave up all his worldly possessions to promote its objects and further his religious belief, the understanding being that the class was to live as one family, and the money he then had and the proceeds of his future labors were to be used for the support of the class, under the Apostolic doctrine that all things were to be held in common, and all were to subsist out of the common treasury; also that no stranger, or any person who was weary and heavy laden, was to be turned away without food and comfort.

That such was a high ideal none can question who believe in the Holy Writings, or who has but the least degree of a common historical faith. The belief of the plaintiff and the devotion of the little class of which he became a member, to further the aspirations of which he dedicated his all, is not without support in the Scriptures. The early Christians, who were converted on the day of Pentecost, it is said, continued steadfastly in the Apostolic doctrine: "And all the multitude of them that believed were of one heart and of one soul; neither said any of them that aught of the things which he possessed was his own; but they had all things in common. Neither was there any among them that lacked; for as many as were possessors of lands or houses sold them, and brought the prices of the things that were sold, and laid them down at the Apostles' feet; and distribution was made unto every

man according as he had need." Acts ii: 44, 45; iv: 32, 34, 35.

The plaintiff, in common with the other members of the class, interpreting the Scriptures to enjoin communal life as a cardinal doctrine of the Christian faith, should not be heard to complain that the substance which each contributed to the family fund has been consumed by the family, and others who were found hungry, as the substance was intended to be consumed. Indeed, that the contributions made by plaintiff and the others were for no temporary expediency, or with any thought of a return, is emphasized by reading in the chapter quoted of the awful fate of Ananias and Sapphira, his wife, for their hypocrisy in concealing a part of the price of their property. This visitation of wrath, we are persuaded, must have deeply impressed the mind of plaintiff; for it is not intimated in the record that he was guilty of the concealment of any part of the price in making his contribution.

The evidence is rather vague as to how many of the class had worldly possessions to sell, and having sold placed the price thereof in the common fund. Quite a number of them did, and others had nothing wherewith to replenish. This, however, was their faith, that the poorest in goods were the riches in spirit. Thus equipped the Spiritual Class chartered a special car, traveling over the country and to California. Upon arriving in California they discarded the car and procured wagons and teams, traveling thereby up and down California and thence to Yuma. On the way they devoted their time to preaching the Gospel and in the interpretation of the Scriptures according to their understanding, and with such powers to speak the Word as they possessed. Such converts were made to their belief as were disposed to look upon individual ambitions and the separate ownership of property as a selfishness to be eradicated for the better opportunity of knowing and serving God. Quite a number were thus attracted and converted and, of course, fed from the common table, which caused some isolated feelings of discontent among some of the older members; for it is not shown that any of the new converts were possessed of goods wherewith to augment the treasury. Street meetings were held, jails were visited, and the hungry never turned away from the common treasury. It is an incontrovertible truth in arithmetic that the result of subtracting, if

continued, without adding, is nothing. However, these high
ideals of self-abnegation and the crucifixion of such desires
and appetites as tend to divert attention from God were at
times tinged with just a little corruption and bitterness of
spirit. It began to be noticed that as many as thirty hungry
strangers sat in one day at the common table; that some of
the members of the class consumed more of the food and of
a better quality than was considered their portion; that some
were less inclined than others to outstrip their brethren in
the severer and less attractive tasks of work so necessary to
replenish the commissary. It was noticed there was wanting,
at times, that *"esprit de corps"* with which each should have
striven, one with the other, to accomplish the most for the
common good, and which spirit of emulation is, perhaps, some-
what necessary for perfect accord among those who practice
the doctrine of communal life. In fact, the plaintiff is not
entirely without fault; for at times he became petulant over
somewhat trifling considerations. Thus at one time he com-
plains because his wife desired a spool of white thread, which
was not forthcoming, and upon another occasion his boy re-
quired a pair of socks, which by others of the class were
thought unnecessary for his welfare; and plaintiff's wife
could ill conceal a feeling of disgust because everybody that
came along hungry got something to eat, when her boy was
refused the socks. But these occurrences were mere ripples
on the surface, and little relapses into selfishness which is so
hard for mankind to eradicate from his nature all at once.
Along with this professed stifling of desire and self-abnega-
tion, it appears the members persuaded themselves that by
their faith and mode of life they would each in time be given
power to stretch forth the hands and heal, and that signs
and wonders would be done by each.

That absolute self-abnegation and an utter limitation upon
aspiration and ambition is accompanied with a lurking desire
for the possession of miraculous power may appear incongru-
ous to some, but of this each individual must determine for
himself. The plaintiff was somewhat impatient because in so
short a time he had not become possessed of such power; but
it is said in the Scriptures that the faith necessary to move
the mountain must be implicit, steadfast, and unwavering,
and we may, without harshness, ascribe to plaintiff that his

XIV Ariz.—29

inability to acquire this extraordinary power may have proceeded from a lack on his part of such faith.

The creed this class was organized to promote may appear absurd to some as not adapted to the requirements of modern life; not so, however, to others, as instance the Moravians, Shakers, the Oneida Community, Amana Society, and Zionists. The most striking instance may, perhaps, be the social fabric of China as it was some years ago, which can be connoted under the term "solidarity." Among the Anglo-Saxon race the idea strongly prevails that each man is an individual by himself, and is to be dealt with as such; that the individual is the social unit. Not so in China. The Chinese Empire was (theoretically) a vast whole, with a head who governed by the decree of heaven. Each gradation from the empire as a whole, down to the individual and collective family, is likewise a unit, of which the parts are mutually interdependent and mutually responsible for each other. It has been said that a Chinese family is like a hill of potatoes—one cannot get at any of them without a process by which all are brought to view. Chinese social life runs in ruts, and in very ancient ruts, and the man in China is but a part of a gigantic social machine—a mere cog in one of many wheels. It is a common thing there for the individual collective family to live in one place for centuries; sometimes the family will number two or three hundred persons, whose labor and property is controlled by the oldest male ancestor for the common good; and for the conduct and behavior of each member of the family the ancestor is held responsible. There seems to be in the Chinese nature an inherent capacity for combination, united with a powerful tendency to combine, which is, perhaps, as yet strange to the Occidental. This power of cohesion, or, as has been observed, a kind of chemical union, of the Chinese nature probably proceeds from their belief in filial piety and ancestral worship as the golden rule of conduct practiced by them for many centuries. The emperor, being the head of the family, is worshiped as such, and in turn each head of a subordinate family is worshiped by its members.

Epictetus, who carried human reason to so great a height, thought it a necessary qualification in a teacher sent from God for the instruction of mankind to be destitute of all external

advantages, and a suffering character. He bore testimony to the propriety of that method which divine wisdom hath thought fit to follow in the scheme of the Gospel, whose great Author had ''not where to lay his head.'' A modern writer says: ''If we open our eyes, and if we will honestly acknowledge to ourselves what we discover, we shall be compelled to confess that all the life and efforts of the civilized people of our times is founded on a view of the world which is directly opposed to the view of the world which Jesus had.'' Strauss, Der Alte und der Neue Glaube, p. 74.

Some moralists have considered the creation as the temple of God, which he has built with his own hands, and which is filled with his presence. Others have considered infinite space as the receptacle or rather the habitation of the Almighty.

Sir Isaac Newton considered infinite space as the sensorium of the Godhead, and observed that ''brutes and men have their sensoriola or little sensoriums, by which they apprehend the presence, and perceive the actions, of a few objects that lie contiguous to them. Their knowledge and observation turn within a very narrow circle. But as God Almighty cannot but perceive and know everything in which he resides, infinite space gives room to infinite knowledge, and as it were an organ to omniscience.''

The sphere in which we move and act and understand is of a wider circumference to one creature than to another, according as we rise one above another in the scale of existence, as by climbing up a hill in the midst of a wide plain a man hath his prospect enlarged. The trouble is with most of us, in Mr. Locke's words, ''We see a little, presume a great deal, and so jump to the conclusion.''

The law is not the keeper of a man's conscience, and it is not within the province of any department of the government to settle differences in creeds, or to determine what ought or ought not to be a fundamental of religious belief, so long as the professed creed is not subversive of the peace and good order of society. It is the proud boast of our institutions that all opinions are tolerated, and entire freedom of action allowed, unless such interferes in some way with the rights of others. The liberty of conscience is secured by the provisions of our constitution, circumscribed only by the limitation that

such liberty shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the state. The true benefit of the higher education is not to clothe the man with power to accumulate or display fine parts among his fellow-men by employing himself about philosophic syllogisms or sophistical argument, but rather to uproot prejudices and give a broad tolerance for the rights and opinions of others, dropping the readiness to be offended and to hate, but to commiserate and pity rather.

It does not seem that in any of the cases before the courts has a society, whose religious tenets inculcated communistic features, been regarded open to objection as contravening law or any public policy. *Waite* v. *Merrill,* 4 Me. (4 Greenl.) 102, 16 Am. Dec. 238; *Gass* v. *Wilhite,* 2 Dana, 170, 26 Am. Dec. 446; *Schwartz* v. *Duss,* 187 U. S. 10, 47 L. Ed. 53, 23 Sup. Ct. Rep. 4; *Goesele* v. *Bimeler,* 14 How. 590, 14 L. Ed. 554; *Burt* v. *Oneida Community,* 137 N. Y. 346, 19 L. R. A. 297, 33 N. E. 307; *State* v. *Amana Society,* 132 Iowa, 304, 11 Ann. Cas. 231, 8 L. R. A., N. S., 909, 109 N. W. 894.

In *Schriber* v. *Rapp,* 5 Watts (Pa.), 351, 30 Am. Dec. 327, it was said: "It may be true that the business and pursuits of the present day are incompatible with the customs of the primitive Christians; but that is a matter for the consideration of those who propose to live in conformity to them. Our laws presume not to meddle with spiritualities; and religious societies are regarded by them but with an eye to their temporal consequences."

In *Ellis* v. *Newbrough,* 6 N. M. 181, 27 Pac. 490, it was held that a declaration in an action of trespass on the case for damages for deceit, alleging that plaintiff, who was a man of ordinary understanding, was induced to join a religious community, one of the tenets of which was that all property should be held in common, but that the professed principles of the community were not fully put into practice, did not state a proper cause of action.

The plaintiff is not in this court by guardian, and the presumption follows that he is a man of ordinary intelligence, and capable of forming such opinions with reference to the disposition of his property as may, in his judgment, conduce to the betterment of his spiritual as well as temporal welfare.

The cases cited by appellee, where judgments on a count

in *indebitatus assumpsit* were upheld on appeal, are not in point; for in those cases a clear duty on the part of the defendant to pay was shown, from which the law implied a promise to fulfill the obligation. No such showing is made in this case.

In parting, the appellee may be admonished that vanities and many vexations attend this business of life. He may apply to himself a great part of St. Paul's catalogue of sufferings: "In journeyings often, in perils of waters, in perils of robbers, . . . in perils among false brethren; in weariness and in painfulness, in watchings often, in hunger and thirst, in fastings often." Solaced with the thought that thereby he lay up to himself treasures in heaven, or, as a great philosopher said, "provided such possessions as fear neither arms, nor men, nor Jove himself," the law of man cannot aid him. "O, that I knew where I might find him!" says Job. "Behold I go forward, but he is not there; and backward, but I cannot perceive him: On the left hand where he does his work, but I cannot behold him; he hideth himself on the right hand that I cannot see him."

Such tribulations have been a source of perplexity to the greatest and most serene and patient minds, and a cause for great dispute among the most learned, who have been never suspected either of superstition or enthusiasm. Every man's experience must inform him in this matter, though it is very probable that this may happen differently in different constitutions.

The soul has a wonderful power of producing her own companions, and is transported into a thousand scenes of her own raisings. As Dryden so beautifully expresses it:

> "She seems alone
> To wander in her sleep through ways unknown,
> Guideless and dark."

The record in the cause shows that appellee revolted from the Spiritual Class at Yuma some time during February, 1912, perhaps overlooking the admonition in the second epistle of St. John: "Whosoever revolteth and continued not in the doctrine of Christ hath not God, but he that continueth in the doctrine hath both the Father and the Son."

One remaining matter may be adverted to. The necessity for a divine revelation is evident from the universal desire for it. The testimony shows that this Spiritual Class desired revelations, and believed such would be brought by the ghosts of dead men speaking through a tin horn or trumpet. The spirit at times spoke to the class through the trumpet, and this circumstance lately caused appellee to feel that, perhaps, it was of the devil, and some fraud may have been practiced. Such a matter may not be determined by this court. That a revelation may come through a trumpet hath also some countenance in the Holy Writings; for St. John, the Apostle, says: "In the days of the seventh angel, when he shall begin to sound the trumpet, the mystery of God shall be finished, as he hath declared by his servants the prophets." Many, perhaps, will conceive the impossibility of a revelation being so afforded; but such statement must be interpreted by the reader according to his own judgment, and then he must determine for himself whether that be one of the parts inspired by God, or merely emanating from the unaided reason of the writer. We cannot pretend to determine it.

Upon a careful consideration of the whole record, we cannot conclude that the appellee is entitled to recover.

The judgment of the lower court must accordingly be reversed, with instructions to vacate the judgment and dismiss the action. It is so ordered.

CUNNINGHAM and ROSS, JJ., concur.

---

NOTE.—As to intervention by the courts in disputes between members of voluntary unincorporated religious societies, see note in 68 Am. St. Rep. 864.