[No. 23624. Department One. April 4, 1932.]

SEVENTH ELECT CHURCH IN ISRAEL, *Respondent*, v. FIRST SEATTLE DEXTER HORTON NATIONAL BANK, *Defendant*, STELLA BURKE *et al.,* *Appellants.*[1]

'Reported in 10 P. (2d) 207.

*Alexander H. McKinnon, J. Speed Smith,* and *Christopher Jacobsen,* for appellants.

*Preston, Thorgrimson & Turner,* for respondent.

BEELER, J.—About 1910, Daniel Salwt appeared in Seattle as the prophet of a new religious cult designated by him as the "Seventh Elect Church in Israel." He claimed to be a messenger from God, commanded to gather together 144,000 persons to be known as the "Elect of God." His teachings were that the cult would grow and prosper until it reached a membership of 144,000 of the Elect of God, and then the entire membership would be translated into heaven without physical death. He made little or no progress during the first eight or ten years, but in 1921 he had gathered together eight members and sufficient funds to build a church. Living quarters were provided for in connection with the church.

From 1921 to June 14, 1929, the date of Salwt's death, the number of his followers varied somewhat, but on the average the church had a membership of twenty-five persons. The members were principally day laborers, such as shingle weavers, plasterers and mechanics, earning from three to five dollars a day. Those who lived at the church were required to lay all their earthly goods upon the altar in the nature of free will offerings. They lived in common and had one pocket-book. Salwt, as well as the other members or disciples, would preach or exhort upon the public streets of Seattle, and distribute literature or "religious tracts" setting forth the teachings and doctrines of the church.

Salwt and his adherents banded themselves together as a voluntary association until 1922, when they organized a corporation. Salwt became its president and treasurer, and remained its leader until his death,

at which time there was on deposit in his name in two banks at Seattle, money in excess of $103,000. In addition thereto, several pieces of real estate situated within the state of Washington stood in his name.

The First Seattle Dexter Horton National Bank was appointed and qualified as administrator of his estate, and filed an inventory as required by law. Claims were filed by the appellants with the administrator, which the latter rejected.

February, 1930, the respondent instituted this action, and in its complaint alleged that Salwt had received the real estate and the money on deposit in the two banks for the use and benefit of the church and its members, and that all of the property and money was held by the decedent in trust for the church; that the appellants' claims were spurious and false; that the decedent, Salwt, was not indebted to the appellants or any of them, and the respondent church undertook to impress a trust upon these funds in its favor. The appellants, in their answer, denied all the material allegations of the complaint, and by way of cross-complaint prayed that these same funds be impressed with a trust in their favor. The cross-complaint sets forth the respective claims of the several appellants to the funds under the control of the administrator.

The administrator interposed a demurrer to appellants' cross-complaint, which was sustained by the trial court. The appellants declined to plead further and appealed to this court. The judgment of the lower court was reversed, and the cause remanded for trial. *Seventh Elect Church in Israel v. First Seattle etc. Bank,* 162 Wash. 437, 299 Pac. 359. The opinion there should be read in connection with the opinion here.

On July, 1931, the cause proceeded to trial upon the merits, and resulted in a decree whereby all of the property, both real and personal, in the hands of the

administrator, except the cost of administration, was given to the church, and the appellants' causes of action were dismissed, from which decree they have appealed.

The appellants contend that, since this court, in the case of *Seventh Elect Church in Israel v. First Seattle etc. Bank, supra,* overruled the demurrer of the administrator to the appellants' cross-complaint, thereby holding that the cross-complaint stated facts sufficient to constitute a cause of action, the judgment or decree appealed from must be reversed, because, as they contend, the evidence is sufficient to sustain the allegations of the cross-complaint.

Parenthetically, it should be pointed out that the former appeal was between the *administrator* and these appellants, whereas the controversy on this appeal is between the *church* and the appellants.

The controlling question, then, is whether the evidence is sufficient to sustain the allegations of the appellants' cross-complaint. The material allegations in each of the several causes of action in the cross-complaint are:

"That the said decedent was the organizer and head of a certain religious cult known as the Seventh Elect Church in Israel; that he called himself and was known as the 'Messenger' and taught that those who followed him would never die and that he would lead them into heaven without going through the physical destruction of the body called death; . . . that the decedent had established the rule for his followers that while belonging to the cult they must leave *with him for safekeeping all they owned of money and property and all they earned; that the deposits so made were to be kept by the decedent for the depositor's account, the ownership thereof always remaining in the depositor.*" (Italics ours.)

Each of the appellants further alleged that they became disciples of Salwt because they believed in him and in his teachings.

■ From our review of the record, we are of the opinion that the evidence does not support the allegations of the cross-complaint, and especially the material portions thereof which we have italicized. The moneys and property contributed and conveyed by the several appellants were not given to Salwt for *safekeeping,* but were given to him as free will offerings, for the use and benefit of the church, without reservation and for the purpose of aiding the church in spreading the gospel and the doctrines believed in and taught by all of the appellants as well as by all of the members of the church.

Furthermore, the evidence is clear that Salwt did not claim the money nor property as his own. He dealt with it as though it belonged to the church. Salwt did not personally profit from the free will offerings. He lived a lowly life, as did the rest of the disciples of the church. They preached upon the streets of Seattle, in weather bad or fair; a fervent and devoted religious sect, seeking not earthly reward but preparing themselves for a broader and nobler life.

But as time went on, the appellants became lukewarm, and from January, 1926, to October, 1928, one by one they withdrew from the church. These withdrawals all occurred prior to the death of Salwt. The appellants brought no independent action to recover the moneys and properties they had contributed, nor to recover for the value of the services rendered by them, but filed their cross-complaint after this action had been instituted by the church. From two to five years elapsed from the time the various members withdrew up to the time this action was brought. The appellants, having withdrawn and seceded from the

church, now seek to recover their contributions, whether in money or property, and seek compensation for services rendered.

The law is well settled that, where members of a church withdraw or secede, either singly or in a body, they forfeit all their rights to the church property. They cannot recover that which they voluntarily turned over to the church.

" 'The separation or secession of part of the members from a church does not destroy the identity of the church or lessen the rights of those adhering to the organization, but members seceding from a church thereby forfeit all rights to the church property, and the courts, when called upon, will award the property, and all rights pertaining thereto, to those who continue to adhere to the doctrine, tenets, and rules of the church as they existed before the division, . . .' 34 Cyc. 1167.

"*Lost River Norwegian Evangelical Congregation v. Thoen,* 149 Minn. 379, 183 N. W. 954; *Apostolic Holiness Union of Post Falls v. Knudson,* 21 Idaho 589, 123 Pac. 473; *Slinker v. Sumner County Building & Loan Ass'n,* 96 Kan. 672, 153 Pac. 537; *Christian Church of Vacaville v. Crystal,* 78 Cal. App. 1, 247 Pac. 605." *Saints of Spokane v. Bailey,* 153 Wash. 294, 279 Pac. 750.

The rule is well stated in *Borgman v. Bultema,* 213 Mich. 684, 182 N. W. 91:

"Under our well established rules of law, acquiesced in by all our courts, and which, as I understand it, no one disputes, where property is dedicated to the use of a religious denomination it cannot thereafter be diverted to the use of those who depart from that faith, but must remain for the use and benefit of those who still adhere to the faith. It is conceded that the property in question in this case has been dedicated to the use of those who adhere to the faith of the Christian Reformed Church, and that it must there remain, and should it appear that any have departed from that

faith they cannot claim the right to take the property with them."

All of the appellants, except two, executed a "free will offering contract," dated April 5, 1926. This contract reads:

"April 5, 1926.

"Free Will Offering Contract

"It is hereby stipulated and agreed by and between Daniel Salwt, the president and treasurer of the Elect Church in Spiritual Israel, of the second part, and all who undersign are and are known as the party of the first part: Whereas the party of the first part does covenant and agree with the party of the second part that in consideration of a home with the party of the second part does assign all his possessions over to the party of the second part, mortgages, bonds, lands, houses and lots, moneys and other securities that have any value and is accepted by the party of the second part. It is further agreed by first and second parties that the party of the first part can walk out of the association at his or her will but there is no redemption of property of any description whatsoever. The party of the second part at his own option help the party of the first part with the consent of the trustees, not otherwise. It is hereby understood that this benevolent society take up no collections in the church or out of it, but is strictly living on free will offerings only. All who subscribe their names to this contract become a member of this Elect Church and agrees to live in common as the apostles of old who sacrificed all: Neither are we allowed to have more than one pocket-book; Neither are we allowed to eat off of the mountains. It is further agreed all who sign this contract will do his best to support the church and to gather the Elect of God and do all he can to become of one mind and sling no slurs or insults or be offensive in any way. It is further agreed by first and second parties they will not conspire between themselves to withhold money of any amount: Any person found guilty of misdemeanor of this kind forfeits his right to the home and is expelled from the parsonage or home after a fair trial, and he sacrifices all he gave as a free

offering to the Elect Church; this includes both male and female. Know all men by these presents: all who sign this contract sign it with their own free will, not being overpersuaded by anybody, but do it for the benefit of The Association in which they belong."

It is apparent that this free will offering contract was simply an embodiment of the teaching and understanding of all the members of the church. The appellants in their brief say:

"A reading of the free will offering contract will disclose that it is not more than a reduction to writing of the teachings and rules theretofore and thereafter taught and governing the members."

Under the terms of this contract, the appellants were privileged to secede and sever their connection with the church, but, doing so, they forfeited all right to their free will offerings, which became the property of the church.

True, Salwt told his followers he would never die, that he would lead them into heaven in the flesh. But these were not statements of fact. They were mere expressions of opinion, prophesies of a religious belief. Sacred Writ tells us that Elijah and Enoch were translated into heaven without death.

It is the law that courts will not interfere with the liberty of conscience, and with the rights of every individual to select his own religious beliefs, so long as they are not against the peace and good order of society.

"The law is not the keeper of a man's conscience, and it is not within the province of any department of the government to settle differences in creeds, or to determine what ought or ought not to be a fundamental of religious belief, so long as the professed creed is not subversive of the peace and good order of society. It is the proud boast of our institutions that all opinions are tolerated, and entire freedom of action allowed,

unless such interferes in some way with the rights of others. The liberty of conscience is secured by the provisions of our constitution, circumscribed only by the limitation that such liberty shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the state." *Ruse v. Williams,* 14 Ariz. 445, 130 Pac. 887, 45 L. R. A. (N. S.) 923.

The appellants having voluntarily contributed their money and property, they are estopped from recovering the same. Nor can they recover for services rendered. *Ruse v. Williams, supra; Ellis v. Newbrough,* 6 New Mex. 181, 27 Pac. 490.

The judgment appealed from is affirmed.

TOLMAN, C. J., HERMAN, PARKER, and MITCHELL, JJ., concur.