[Sac. No. 679.   Department Two.—July 9, 1900.]

H. C. HORSMAN et al., Respondents, v. PARIS ALLEN et al., Appellants.

Trust—Religious Association — United Brethren — Majority and Minority Schism.—A conveyance to trustees named therein and their successors in office "in trust for the United Brethren in Christ for camp-ground, meeting-house, and parsonage purposes," is. for the benefit of what is known as the "liberal" church, constituting a majority of that order, and not of the minority known as the "radical" church of the same order.

Id.—Seceding Minority of General Conference.—A small minority seceding from the general conference of a religious body, which is the highest legislative and judicial body in the church, must be regarded as abandoning the church, if there is no such revolutionary usurpation of power in the governing body as to result in a new and substantially different organization, or in such a radical change of the articles of faith as to constitute an essentially different religion from that previously followed by the church.

Id.— Action of General Conference — Change in Ordinance of Church—Revision of Articles of Faith.—The general conference of the church, as the highest legislative body therein, cannot bind future conferences by adopting a so-called "constitution" which is in its nature a legislative ordinance, and not a constitution to be adopted by the members of the church; and a change in such "constitution," together with a revision of the "articles of faith" by a subsequent general conference not touching the identity of the organization, or of the general faith of the church, is valid and binding as an ordinance of the church, if not as a constitution.

APPEAL from an order of the Superior Court of Tulare County denying a new trial.   Wheaton A. Gray, Judge.

The facts are stated in the opinion.

E. T. Cosper, for Appellants.

The liberal church is the true church of the United Brethren in Christ. (*Itter v. Howe*, 23 Ont. App. 236; *Rike v. Floyd*, 6 Ohio C. C. 80; 53 Ohio St. 653; *Schlichter v. Keiter*, 156 Pa. St. 119, 146, 147; *Philomath College v. Wyatt*, 27 Or. 473, 475; *Kuns v. Robertson*, 154 Ill. 394, 415, 416; *Russie v. Brazzell*, 128 Mo. 93.[1]) It is not the province of temporal courts to assume ecclesiastical jurisdiction and the decisions of the ecclesiastical body itself are to be taken as final and conclusive. (1 High on Injunctions, secs. 310, 314, and cases cited *supra;* *Auracher v. Yerger*, 90 Iowa, 566; *Wheelock v. First Pres. Church of Los Angeles*, 119 Cal. 482; *Russie v. Brazzell*, *supra;* *Watson v. Jones*, 13 Wall. 679-733; *Earle v. Wood*, 8 Cush. 467; *Krecker v. Shirey*, 163 Pa. St. 534-58; *Lamb v. Cain*, 129 Ind. 512, 518; *Pounder v. Ash*, 44 Neb. 672; *Connitt v. Reformed Prot. Dutch Church etc.*, 54 N. Y. 551-61; *East Norway Lake Church v. Halvorson*, 42 Minn. 503.) A legislative body cannot bind its own future action by a mere law or ordinance. (*Bloomer v. Stolley*, 5 McLean, 158; *Richardson v. Union Cong. Soc.*, 58 N. H. 187; *Smith v. Nelson*, 18 Vt. 512; *Mongeon v. People*, 55 N. Y. 613.) There was no radical change of faith or perversion of the trust by the revision. (*Lamb v. Cain, supra; Itter v. Howe, supra; Brundage v. Deardorf*, 92 Fed. Rep. 214.) Seceding members forfeit their right to the church property. (*Wiswell v. First Congregational Church*, 14 Ohio St. 32; *Methodist E. Church v. Wood*, 5 Ohio, 283; *McGinnis v. Watson*, 41 Pa. St. 8; *Den v. Bolton*, 12 N. J. L. 206; *Associate etc. Church v. Theological Seminary*, 4 N. J. Eq. 77.)

Davis & Allen, for Respondents.

The question is one of identity of the church of the United Brethren in Christ. (*Brundage v. Deardorf*, 55 Fed. Rep. 839, 846; *Bear v. Heasley*, 98 Mich. 279; *Schnorr's Appeal*, 67 Pa. St. 146[2]; *Philomath College v. Wyatt*, 27 Or. 390, dissenting opinion of Wolverton, J.; *Watson v. Jones*, 13 Wall. 679.) The revision essentially changed the articles of faith, and the radical church alone represents the original faith. (*Brundage v. Deardorf*, *supra; Bear v. Heasley, supra.*) Questions of creed and church.

[1] 49 Am. St. Rep. 542.
[2] 5 Am. Rep. 415.

government may be determined by the court, when property rights are affected thereby. (*Smith v. Nelson*, 18 Vt. 511; *Watson v. Avery*, 2 Bush, 332; *Watson v. Garvin*, 54 Mo. 353; *Gartin v. Penick*, 5 Bush, 110.) The old constitution and confession of faith were as much parts of the trust deed as if written therein. (*Hale v. Everett*, 53 N. H. 11, 70[3]; *Watson v. Jones*, 13 Wall. 683, 720; *Miller v. Gable*, 2 Denio, 548.) The trustees are perverting the trust by allowing the defendants to occupy, and equity will give relief in such case. (*Harrison v. Rowan*, 4 Wash. C. C. 202, 206; *Barclay v. Howell*, 6 Pet. 498, 507; *Watson v. Jones, supra;* 1 Beach's Modern Equity Practice, sec. 70.)

SMITH, C.—The controversy in this action grows out of a schism in the Church of the United Brethren in Christ, occurring at the general conference of the church at York, Pennsylvania, in the year 1889.

The Church of the United Brethren originated in a voluntary association of Protestants of various denominations at some period during the eighteenth century; and its original creed was simply that of the orthodox Protestant churches generally, but allowing divergencies in matters wherein they differed. It received its first organization from a conference of its ministers held at Baltimore, Maryland, in the year 1789. Its first general conference was held at Mt. Pleasant, Pennsylvania, in 1815; at which time a form of discipline and a confession of faith were adopted. Up to this time the church was without any formal discipline or confession of faith, nor until the year 1841 did it have any constitution.

In that year an instrument know as the "constitution" of 1841 was adopted by the general conference. It is distinguished from other ordinances of the general assembly only in the name given to it, and in the nature of its contents. Its preamble reads: "We, the members of the Church of the United Brethren in Christ . . . . ordain the following articles of constitution." This would seem to indicate that a submission of the constitution to the members of the church for adoption was contemplated, but in fact it was not so submitted. It contained, among

[3] 16 Am. Rep. 82.

other provisions, the following: 1. No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands; 2. There shall be no connection with secret combinations; 3. There shall be no alteration of the constitution unless by request of two-thirds of the whole society.

At the general conference of 1889 a new constitution and a revised confession of faith were adopted by a vote of one hundred and ten to twenty. Thereupon the minority assembled in another part of the city, and undertook to carry on the session of the conference—claiming that it had exceeded its powers, and that the other delegates, by their illegal action in adopting and adhering to the amended constitution and revised confession, had abandoned the Church of the United Brethren in Christ and organized another and distinct church. Both organizations continued to use the old name; and their respective adherents have come to be called—those of the majority organization, "liberals"—those of the minority, "radicals." Since then the schism has become general throughout the United States. In the Tulare circuit (the *locus* of the matters involved in this suit) most of the members (seventy-five out of eighty) have gone with the radical division of the church.

The immediate purpose of this action is to determine the respective rights of the parties to the use and control of two tracts of land situate in the county of Tulare, conveyed, in the years 1878 and 1879, to G. D. Wood et al., "trustees, and their successors in office, in trust for the United Brethren in Christ for camp-ground, meeting-house and parsonage purposes."

The plaintiffs are the trustees elected by the quarterly conference of the radical church for the management of the church property; the defendants occupy a similar position with regard to the liberal church, and are in the occupation of the property in controversy.

It is alleged and found that the legal title to the lands in question is in the plaintiff. But the action of the quarterly conference could not operate to transfer the title of the original trustees to the new trustees appointed by it. (*Blakeslee v. Hall, etc.*, 94 Cal. 159; Waterman on Corporations, 28, 29, 31.) The title to the land is therefore still vested in the trustees named in the deeds, or such of them as survive. The error is,

however, immaterial for the purposes of this case. The legal title is held upon the trusts named in the deed. Under these the officers and members of the local church have the right to use and occupy the lands in accordance with the regulations of the church; and these rights may be vindicated, in an appropriate action, by any of them suing for themselves and the others. (*Baker v. Ducker*, 79 Cal. 372; *Watson v. Jones*, 13 Wall. 720.) Hence, the plaintiffs, if they represent the true Church of the United Brethren in Christ, have the right to occupy and control the lands in question, and, if hindered in the exercise of the right, may maintain the action. The sole question, therefore, is as to the identity of the church. If the radical is the true church, the plaintiffs are entitled to recover; otherwise not.

This question has been involved in numerous cases—some resulting in favor of the radical, some in favor of the liberal organization. Of the former kind are the cases of *Brundage v. Deardorf*, 55 Fed. Rep. 839, and *Bear v. Heasley*, 98 Mich. 279; of the latter, *Schlichter v. Keiter*, 156 Pa. St. 119; *Kuns v. Robertson*, 154 Ill. 394; *Lamb v. Kane*, 129 Ind. 486; *Russie v. Brazzell*, 128 Mo. 93[4]; *Itter v. Howe*, 23 Ont. App. 236; *Rike v. Floyd*, 6 Ohio C. C. 80, 53 Ohio St. 653; *Philomath College v. Wyatt*, 27 Or. 390. We agree in the conclusion and generally with the reasoning of the latter cases.

There is, it must be admitted, a very strong *prima facie* case against the plaintiffs. The radical division of the church—represented by them—had its origin in the secession of a small minority from the general conference—"the highest legislative and judicial body . . . . in the church." In such a case the seceding body must, in general, be regarded as abandoning the church; nor is there any exception to this rule unless in the case of a usurpation of power in the governing body so revolutionary in its character as to result either in the creation of a new and essentially different organization, or in such a radical change of the articles of faith as to constitute an essentially different religion from that previously followed by the church. (*Watson v. Jones, supra.*)

[4] 49 Am. St. Rep. 542.

These and other principles involved in the case are elaborately and profoundly discussed by Judge Miller in the case cited. The courts are in no way concerned with the transactions of ecclesiastical bodies except in so far as tangible rights of person or property are affected. Questions relating to these are divided by the court into three classes: The first is where property, by the express terms of the grant, "is devoted to the teaching, support, or spread of some specific form of religious doctrine or belief"; the second, where it is held by or in trust for an independent congregation; and the third, where it is held by or in trust for a congregation or other association subordinate to some general church organization. The case, it will be observed, belongs to the last of these categories; and the decisions bearing on the first have no application. In cases of this class the trust can be affected only by a change of political organization, or of religious creed of the kind we have described—that is to say, so radical in nature as to affect the identity of the original organization, or of the original faith. Accordingly, the plaintiffs' case rests upon the alleged existence of these grounds; and the justice of this contention is the question to be determined.

The specific claim made is that the act of the general conference in the premises was in violation of the three provisions of the constitution of 1841, cited above, and therefore *ultra vires*. The position of the plaintiffs, therefore, seems to rest upon three grounds, namely: 1. Failure to observe the requirements of the old constitution relating to its amendment; 2. The repeal of the article as to secret societies; and 3. The revision of the confession of faith. But the second and the third of these grounds are involved in the first, in so far that a decision against the plaintiffs on that must be conclusive also as to the other grounds. For if the adoption of a new constitution was otherwise within the powers of the general conference, those powers must have extended also to the adoption of the specific provisions complained of. For it cannot be fairly contended that the abrogation of the provision as to secret societies, or the changes made in the confession of faith, were of a character to touch the identity, either of the organization or of the faith of the church. Indeed, it is clear from the record

that the contention of the plaintiffs with reference to these changes is based upon the supposed fact that they were forbidden by the constitution of 1841; and certainly, but for the provisions of that instrument, no objection could be reasonably urged against them. It follows, if it be assumed that the change of the constitution was otherwise within the powers of the general conference, that these objections fall to the ground; they become material only on the contrary assumption. The case may therefore be considered under two aspects, namely: 1. Upon the assumption that the action of the general conference in adopting the new constitution was in violation of the provision of the constitution of 1841 as to amendments, and therefore *ultra vires;* and 2. As involving the question of the validity of the action of the conference in this regard. Under either aspect we are of the opinion that the merits of the case are with the appellants, but, in view of the importance of the questions involved, both aspects of the case will be considered.

1. The case was considered under the former aspect in *Bear v. Heasley, supra.* In that case the judges agreed in holding that the general conference, in adopting the new constitution, failed to observe the requirements of the constitution of 1841, and that its act was therefore void. The majority of the court held that by this action the general conference, and those members of the church who adhered to it, put themselves outside the pale of the church, which thereafter consisted of the minority organization. But we regard the reasoning of the dissenting judge (Grant, J.) as the most satisfactory, and will adopt it: "Grant that the action of the conference was illegal in declaring the amendments adopted, it is indeed a startling proposition that by this act the conference destroyed its identity, ceased to represent the church, seceded from it, and thereby became a new and different church. The proposition finds no principle in law, equity, or good sense upon which to stand. The fifteen who left the regularly constituted conference became the seceders, and not those who remained in it. . . . . The minority in this case have mistaken their remedy. They should have pursued a legal and orderly course, which was clearly open to them. They should have protested, and, failing in this, have applied to the proper courts to determine the va-

lidity of the proceedings to adopt the amended constitution; and, if such courts found them void, they would hold the old constitution in force, and compel the officers of the church to recognize and act under it. This proposition seems to me so clear that I deem further argument unnecessary."

In reaching this conclusion the judge seems to have had in view the changes attempted in the political organization of the church only, and not the effect of the changes in the confession of faith on the creed of the church—a subject already considered by him. For this, perhaps, the courts could not furnish a remedy, or, at least, a complete remedy. Hence could it be held that the revision of the confession of faith constituted an essential change of the faith of the church, the contention of the plaintiffs might be sustained. But questions of this kind are, in general, of purely ecclesiastical jurisdiction; and it is only in very extreme cases—of which this is not one—that the ordinary courts can pass on them. We must, therefore, regard the decision of the general conference—"the highest legislative and judicial body . . . . in the church"—as conclusive upon the question here involved.

In this we agree with Judge Grant in the opinion cited, where the question and the principle governing its decision is thus stated: "It is contended . . . . that the revised confession of faith is a radical change from the old, and that by its adoption the faith and doctrine upon which the church was founded have been subverted and overthrown. . . . . If this contention be sustained it follows that the minority are entitled to the possession of the church property. [But] it is the settled law of this country that the judgments of the judicial tribunals of the church organizations upon matters of faith, discipline, and the general polity and tenets of the church are binding upon the civil courts. . . . . There can be no exception to the rule, except in a case where even in the minds of laymen no doubt can exist, and it is clear, beyond controversy, that the fundamental principles of the church have been destroyed by the one party and been adhered to by the other."

Numerous authorities are cited to the above proposition, and, among others, *Watson v. Jones, supra,* which may be regarded as the leading case, and as such conclusive, upon the question.

Any other rule would be destructive of the liberty which, by the laws of this country, is accorded to religious societies.

2. With regard to the validity of the constitutional amendment, it was held in *Brundage v. Deardorf, supra,* that the action of the general conference in adopting the new constitution was *ultra vires,* and therefore void; and from this—without discussing the question as to the effect of a void amendment of the constitution on the identity of the church—the conclusion was reached that the defendants (representing the radical branch of the church) were entitled to the property in question. The specific point on which the actual decision was rested was that, in the submission of the constitution to the vote of the members, sufficient notice of the submission, and of the day of election, was not given to the entire membership. But the case—being under the Ohio law—must be regarded as in effect overruled by the subsequent decision in *Rike v. Floyd,* 53 Ohio St. 653. In the case last cited, and in other decisions cited *supra,* it was held that the proceedings for the submission of the new constitution to the members of the church constituted a substantial fulfillment of the requirements of the constitution of 1841.

We think, however, while concurring in this view, that the conclusion reached may be placed upon grounds perhaps more satisfactory. The constitution of 1841 was itself but an act or ordinance of the general conference, adopted by it over half a century after the original organization of the church. Nor is there anything in the instrument to differentiate it from other ordinances, except the name and the expression of the will of the general assembly that it should not be amended unless as therein provided. But it is a fundamental principle of the law that a legislative body cannot derogate from the powers of its successors, and that the latest act must always control. The maxim is, *Leges posteriores priores contrarias abrogant* (1 Rep. 25 b, cited Broom's Legal Maxims, 28); and it is difficult to perceive how the application of this maxim can be escaped.

The term "constitution" is used in several senses. In a broad sense of the term we may speak of a constitution resting upon usage, or acquiescence—as in England. But in this country, when we use the term, we refer exclusively to the sovereign acts

of the people, acting by conventions or in other constitutional modes. (Cooley's Constitutional Limitations, 5, 6.) Such constitutions can neither be made, abrogated, or amended otherwise than by written acts of the people generally. The same power that made is competent, and is alone competent, to unmake or alter. Where the power of enacting constitutional laws is vested in the ordinary legislature the same principle applies, but its operation is different. The same body that enacts may repeal or amend. Hence, in England it is an admitted principle that the power of parliament is unlimited in this respect. (Cooley's Constitutional Limitations, 5, 6.)

It cannot be affirmed that the power of making constitutional enactments, otherwise than as implied in the general legislative power, was vested in the general conference of the church; but certainly whatever power was vested in the conference of 1841 was vested in that of 1889; and if this can be assumed to be the power of making constitutional laws, then it follows not only that the former conference could not derogate from the powers of the latter, but that the powers of neither could be impaired by usage or the acquiescence of the church. In England the power of changing the constitution, whether resting upon previous statutes or upon usage, is admittedly in the parliament; and the same principle applies here to the general conference, which is found to be "the highest legislative body . . . . in the church." Obviously, therefore, if we use the term in the American sense, the notion of a constitution adopted by acquiescence is unknown to American constitutional law.

The record, however, does not sustain the proposition that the supposed constitution was acquiesced in as such by the church. The acquiescence was not universal, and there was always a difference of views on the subject. The act of 1841, it is true, was generally obeyed, and to that extent there was an acquiescence. But being the act of the highest legislative body in the church, it was binding on all, and all officers, official bodies, and members of the church were compelled, in this sense, to acquiesce in it.

We must, therefore, regard the action of the general conference of 1889 in adopting a new constitution as valid and binding on the church, if not as a constitution, at least as an ordinance of the church.

We advise, therefore, that the order denying a new trial be reversed and the cause remanded for further proceedings.

Haynes, C., and Chipman, C., concurred.

For the reasons given in the foregoing opinion the order denying a new trial is reversed and the cause remanded for further proceedings.

Temple, J., McFarland, J., Henshaw, J.

Hearing in Bank denied.