[Civ. No. 3070. Third Appellate District.—May 7, 1926.]

CHRISTIAN CHURCH OF VACAVILLE (a Religious Corporation) et al., Appellants, v. E. C. CRYSTAL et al., Respondents.

[1] CHURCHES—INDEPENDENT ORGANIZATIONS—SCHISM—USE OF PROPERTY.—When property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned owes no fealty or obligation to any higher authority, with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society, in the case of a schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations.

[2] ID. — SEPARATION BY MINORITY GROUP — RIGHT TO USE PROPERTY. If the principle of government in such cases is that the majority rule, then the numerical majority of members must control the right to the use of the property; and if there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property, and the minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congre-

---

1. See 23 R. C. L. 453.

2. Majority control over property of independent or congregational church, see note in 8 A. L. R. 108. See, also, 22 Cal. Jur. 792; 23 R. C. L. 454.

gation; and this rule admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization.

[3] ID.—VOLUNTARY SEPARATION—LOSS OF USE OF PROPERTY.—Where the minority group in a local church congregation, which is strictly independent of all other ecclesiastical organizations and in no manner subject to control or supervision by any higher or superior church authority, secedes from the congregation and refuses to recognize its authority, and both the minority and the majority groups continue to adhere to the tenets and doctrines originally taught by the congregation, and the majority group continues to adhere strictly to such tenets and doctrines for at least six months after the schism, the separation of the minority group from the original congregation is as complete as if it existed for many years, and by such voluntary separation the minority group abandons not only the congregation, but also any right which that group theretofore had to the control or use of the property of the congregation.

[4] ID. — ORGANIZATION OF SEPARATE CONGREGATION. — Where such minority group separates into a distinct body and refuse to recognize the authority of the original congregation, not by reason of any change in doctrinal beliefs or practices on the part of the congregation, but because the congregation decides, by a majority vote of the entire membership, to discharge the pastor and not to call a minister immediately, but until such time as a suitable one can be procured, and such minority group organizes itself into a separate congregation, having its own officers and pastor, and thenceforth regularly conducts religious services apart from the original congregation and at a different place of worship, it becomes as distinctly a separate congregation as if it had never been connected with the original congregation.

[5] ID.—EFFECT OF SEPARATION—RIGHTS OF PARTIES.—Where such minority group, by its own voluntary acts, becomes such distinct separate congregation, the rights of the parties must be determined upon principles which would apply if the two congregations had been separate and independent of each other from the beginning and the majority congregation had acquired church property for its own religious uses, without any assistance from the minority congregation.

[6] ID. — TEMPORARY ABANDONMENT OF CHURCH PROPERTIES — FORFEITURE OF RIGHTS.—The fact that the majority group of such congregation, experiencing financial difficulties, temporarily affiliates with other religious associations in maintaining a community church and leases the church property for use of other than religious purposes, will not cause such majority group to lose its original

3. See 22 Cal. Jur. 792.

identity and forfeit its right to use said church property, in the absence of any ecclesiastical law or regulation on the subject, especially where the federation is formed with the express understanding that each congregation shall retain its own identity as a separate organization.

(1) 34 Cyc., p. 1169, n. 69.   (2) 34 Cyc., p. 1169, n. 69.   (3) 34 Cyc., p. 1167, n. 66, p. 1168, n. 67.   (4) 34 Cyc., p. 1168, n. 67.   (5) 34 Cyc., p. 1168, n. 68.   (6) 12 C. J., p. 215, n. 19 New; 34 Cyc., p. 1164, n. 56 New.

APPEAL from a judgment of the Superior Court of Solano County. Percy S. King, Judge. Affirmed.

The facts are stated in the opinion of the court.

H. W. Brunk and J. E. Pemberton for Appellants.

W. U. Goodman for Respondents.

FINCH, P. J.—The plaintiffs sued to quiet their alleged title to a certain parcel of land, together with a church building and a parsonage thereon, situated in the town of Vacaville. The defendants were given judgment and the plaintiffs have appealed.

For more than forty years before the commencement of the action there was in the town of Vacaville a congregation of the Christian Church, or Disciples of Christ, the two names being used synonymously. Three tenets of that church are material to the questions raised by the appeal and are as follows: 1. That immersion is the only authorized baptism; 2. That the Lord's Supper should be observed on the first day of every week; 3. That the church government is congregational in form, every local congregation being strictly independent of all other ecclesiastical organizations and in no manner subject to control or supervision by any higher or superior church authority. On the fourteenth day of January, 1892, the land in dispute was conveyed to "J. R. Rogers and J. S. Cunningham, . . . trustees of the Christian Church of Vacaville, the parties of the second part, . . . to have and to hold . . . unto the said party of the second part, and to their successors in office forever in trust for the use and benefit of the Christian Church of Vacaville." It is admitted by the pleadings

that such trustees were chosen "by the congregation of said church" and that the land was purchased and the church building and parsonage thereon were erected "with money donated solely for the purpose of procuring and having a building for religious worship according to the tenets" of the Christian Church and for a residence of the pastor thereof.

In the year 1912 the congregation decided, only one member voting in the negative, to receive and give "a church home" to the "pious unimmersed" of other churches without requiring them to be immersed. One of the defendants testified: "I did not look at it as a vote to join the church. I understand it was a vote to affiliate." Another testified: "We never voted to take anybody in by any other method, nor would any of us have stood for taking anybody in by any other method except by immersion, primarily." A very few persons were received into the congregation, under this "open fellowship" doctrine, without immersion, but all who were so received ceased to be members prior to the division of the congregation into two bodies, in the manner hereinafter stated, and neither of such bodies thereafter admitted any person to membership who had not been immersed, nor is there any evidence that either division taught or advocated such a doctrine. It is deemed unnecessary, therefore, to give further consideration to the contention that the division which the defendants represent "has abandoned the distinctive feature of the church in regard to baptism by immersion."

On account of certain dissensions among the members and of the dissatisfaction of some of them with the pastor of the church, a meeting of the congregation was called by the official board to be held on the fifth day of December, 1920. Practically all of the members attended and participated in the meeting. By a vote of 44 ayes to 32 noes, a motion was adopted to discharge the pastor and "not to call a minister immediately, but until such time as a suitable one could be procured." Other motions were carried by about the same majority. The members of the minority group thereupon withdrew from the congregation and organized as a separate congregation under the name, "Disciples of Christ," and at all times since January, 1921, they have conducted regular services in accordance with the

doctrines of the Christian Church, holding their meetings generally in the Methodist Church building in Vacaville, but sometimes in that of the Baptist Church. During that time they have regularly employed a pastor and have sent delegates to the annual state convention. The majority group remained in possession of the church buildings and conducted Sunday school and communion services therein regularly for about six months after the meeting of December 5, 1920, but did not employ a pastor. No religious services have been held in the Christian Church building since some time in June, 1921. Prior to that time the Presbyterian and Baptist Churches of Vacaville had formed a federation and were holding joint services, each church, however, retaining its identity as a separate church organization. The majority group of the Christian Church was admitted to the federation upon presentation of a petition signed by the members of that group and reading as follows:

"We the undersigned members of the Christian Church of the Town of Vacaville favor the federation of our church with the federation of churches now existing in Vacaville, provided that our proposal of federation meets with their approval. And it is further provided that we retain our identity as an organization as the churches now federated retain theirs, that is in all missionary enterprises."

This petition was signed by 43 members of the Christian Church. The federation of the three churches is known as the Community Church. Defendant Crystal testified: "We . . . celebrate the Lord's Supper regularly monthly. Sometimes the Presbyterian and sometimes the Baptist minister officiates. I have officiated as a member of the Christian Church, being an elder. I am not a minister of the church. . . . I am not an elder in that Community Church, I am an officer. We are still functioning as the Christian Church. . . . We still hold our identity, the same as the Presbyterians and the Baptists. We are simply worshipping as a matter of expediency, the three congregations together. . . . I am an officer of that Community Church. . . . It is served at present by a Presbyterian minister. . . . There was formal action taken by our congregation about affiliating with the Community Church. . . . Notice was given to every member and we met and voted as a matter of expediency for a time to go there. No defi-

nite time, as long as we saw fit, thinking that sometime
we would use our own church building when matters would
get so we could. I am not sure anything was said about
that in the resolution; that was the general understanding
that we could do that as we saw fit.'' The pastor of the
Presbyterian Church testified as follows: ''The Baptist
congregation and the Christian Church congregation affiliate
in holding services with us at this time. . . . We just simply
have agreed to worship and work together, keeping our
identity. . . . We agreed not to intefere with any denomina-
tional creeds or differences, allowing each denomination to
carry on just as it saw fit and our community efforts did
not interfere with any church observance whatsoever. . . .
The individuals contribute to the Community Church, and
all the benevolences of the denominations are handled sepa-
rately by the denomination. . . . The official board of the
Community Church is made up of the officers of the three
denominations. . . . We have no written constitution or
articles of confederation. No writings. We just have
agreed to worship together and work together as Christian
brothers, and we agreed that anybody who is a member
of the three denominations represented is a member of the
Community Church, provided he so desires to be, and if
anybody coming into the federation, if they desire to come
in through either one of the three denominations repre-
sented, very well, that has been the agreement so far.''

On the first day of July, 1921, the defendants leased the
church building to the trustees of the high school district
for a term of one year, reserving the right to use the build-
ing ''for religious or other purposes upon Sundays and
holidays, when same is not in use by the lessee, and during
one night of each week of the said term.'' The lessee went
into possession of the premises under the lease and used
the same for high school purposes, and the premises were
being so occupied and used at the time of the trial, which
commenced October 4, 1923. The defendants have also
leased the parsonage to a tenant who is not a minister.
Defendant Crystal testified: ''On account of crowded condi-
tion of the schools we have let the church building for
school purposes. No alterations made in it but the seats
were removed. They are still in a part of the basement.
. . . The parsonage has been rented and rent collected for

it, $15 to $20 per month or something like that.   The church building was rented for a like sum.   The money has been put in the church treasury.   We pay our taxes out of it and insurance and other things, upkeep and repairs.''

The membership record of the minority group originally contained the names of 29 members.   Four members were thereafter received into the congregation of that group; 2 members died and 5 moved to other localities, leaving a net membership of 26 at the time of the trial.   May 12, 1922, the minority group organized the plaintiff corporation. June 24, 1922, the pastor thereof was directed by the plaintiff trustees to consult an attorney ''about the recovery of the church property.''   The record does not show when the original complaint was filed herein, but the second amended complaint was filed December 12, 1922.

[1]   In *Watson* v. *Jones*, 13 Wall. (U. S.) 679, 20 L. Ed. 666, it is said: ''When the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority, . . . with no other specific trust attached to it in the hands of the church than that it is for the use of that congregation as a religious society,'' in the case of a ''schism which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. [2]   If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property.   If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property.   The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation.   This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to

be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the court will not imply one for the purpose of expelling from its use those who by regular succession and order constitute the church, because they may have changed in some respect their views of religious truth." In *Horsman* v. *Allen,* 129 Cal. 131, 135 [61 Pac. 796, 797], it is said: "The radical division of the church . . . had its origin in the secession of a small minority from the general conference—'The highest legislative and judicial body . . . in the church.' In such a case the seceding body must, in general, be regarded as abandoning the church; nor is there any exception to this rule unless in the case of a usurpation of power in the governing body so revolutionary in its character as to result either in the creation of a new and essentially different organization, or in such a radical change of the articles of faith as to constitute an essentially different religion from that previously followed by the church." The court referred to *Watson* v. *Jones, supra,* "as the leading case, and as such conclusive, upon the question." Since the local congregation involved in this case is supreme in governmental authority, the principles stated in the case last cited are controlling. Appellants rely upon the case of *Christian Church* v. *Church of Christ,* 219 Ill. 503 [76 N. E. 703], where it is said: "When the members of a religious congregation divide, and one faction breaks away from the congregation and forms a new organization, the title to the property of the congregation will remain in that part of the congregation which adheres to the tenets and doctrines originally taught by the congregation to whose use the property was originally dedicated." [3] The rule thus announced in no manner helps the appellants' case, because when they seceded from the congregation and refused to recognize its authority, both factions were adhering to "the tenets and doctrines originally taught by the congregation," and the old congregation continued to adhere strictly to such tenets and doctrines for at least six months thereafter. The separation of plaintiffs from the original congregation was as complete as if it had existed for many years, and it must be held that by such voluntary separation they abandoned, not only the congregation, but also

any right which they theretofore had to the control or use of the property. (*Committee of Missions* v. *Pacific Synod*, 157 Cal. 105, 127 [106 Pac. 395].) [4] They separated into a distinct body and refused to recognize the authority of the original congregation, not by reason of any change in doctrinal beliefs or practices on the part of the congregation, but because the congregation decided, by a majority vote of the entire membership, to discharge the pastor and "not to call a minister immediately, but until such time as a suitable one could be procured." They immediately ceased to attend the religious services thereafter regularly conducted during the succeeding six months by the old congregation at the usual place of worship and organized themselves into a separate congregation, having its own officers and pastor, and thenceforth regularly conducted religious services apart from the original congregation and at a different place of worship. By their own voluntary acts they became as distinctly a separate congregation as if they had never been connected with the original congregation. [5] The rights of the parties must be determined, therefore, upon principles which would apply if the two congregations had been separate and independent of each other from the beginning and the congregation represented by defendants had acquired the property for its own religious uses, without any assistance from the plaintiffs. [6] If the plaintiffs have any standing to maintain this action it must be based upon some fact other than that their members were once members of the congregation represented by the defendants. If the members of the plaintiff organization had retained their membership in the original congregation, and thereby their interest in the property, they would now be in a position to insist, even though in the minority, that the property be devoted to the use for which it was acquired. Such a case was under consideration by the court in *Baker* v. *Ducker*, 79 Cal. 365, 374 [21 Pac. 764, 765], where it is said: "The property in question was held by the Reformed Church in trust for its members, and the defendants, even though they constitute a majority of the members, had no right and no power to divert it to the use of another and different church organization." No case has been cited or discovered, however, which holds that, where two independent and self-governing congregations

of the same religious faith exist in the same community, one of the congregations can, by legal action, acquire the property.of the other on the ground that such other congregation is not using the property for the purposes for which it was acquired. If such an action can ever be maintained, it must be based upon acts or omissions more radical and revolutionary in character than those shown by the evidence in this case. The defendants have not abandoned the property or permanently devoted it to uses other than those for which it was acquired. They certainly were not required to leave the property unoccupied during the time they were unable to use it for religious purposes. Where a small congregation separates into two smaller congregations, it is not unusual for them to experience financial difficulties in maintaining regular church services and activities. Appellants say that the minority group "represented the bulk of the working, active part of the congregation and those who were supporting the church financially." This may account for some of the difficulties which the majority experienced in maintaining themselves as an independent congregation. Under all the circumstances it cannot be said that the facts are such as to require a finding to the effect that the members of the majority group have forfeited their right to the use of the property by leasing it temporarily for other than religious uses and "as a matter of expediency for a time" uniting with the Presbyterians and the Baptists for the purposes of religious worship. The name "Community Church" does not signify a religious association which has distinctive doctrines and beliefs, but rather a federation of two or more churches, all retaining their separate identity and their distinctive doctrines. Such federations are not uncommon. It certainly cannot be held as a matter of law that, by temporarily becoming a member of such a federation, a congregation necessarily loses its original identity and forfeits its right to the use of its property, in the absence of any ecclesiastical law or regulation on the subject, especially where the federation is formed with the express understanding that each congregation shall retain its own identity as a separate organization.

Appellants rely upon certain cases involving the carrying out of the terms of express trusts created by the donors

of property. Those cases are not applicable to the questions here involved. The distinction between the two classes of cases is clearly pointed out in *Watson* v. *Jones, supra,* and *Committee of Missions* v. *Pacific Synod, supra,* and need not be repeated here.

The judgment is affirmed.

Hart, J., and Plummer, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 6, 1926.