[Civ. No. 6174. Second Appellate District, Division Two.—October 8, 1928.]

FRANK DYER, Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY et al., Respondents.

Cooper & Collings for Petitioner.

George Beebe, Schweitzer & Hutton and Bernard L. Herlihy for Respondents.

Halverson & Halverson, *Amici Curiae.*

THOMPSON (IRA F.), J.—Everyone who has had occasion to study the nature and character of the controversy

which gives rise to the present proceeding, must regret that it ever reached the civil courts. Dissensions among members of a religious body are first to be deplored, but it is more distressing to realize that the sensibilities have been so far excited that means have not been found within the ecclesiastical domain to bring about an amicable adjustment of the disputes. Such, however, is the nature of the judicial calling that although we may be grieved by the consciousness that a body of Christians have been so agitated as to reach to the secular courts for relief from their distress, yet the approach to the problems presented must be with the hope that the principles of justice when applied to the situation cannot fail to be of some benefit to those involved in pointing the way out of the present difficulties.

There are pending in the respondent court two actions, the one entitled *W. F. Fliedner et al.* v. *Mark A. Pierce et al.,* wherein it is sought by the plaintiffs to have it adjudged that they are the trustees of the Wilshire Boulevard Congregational Church and that the defendants who claim to have been elected trustees at a special meeting of the church are not in fact trustees, and to enjoin the defendants from acting as trustees or controlling or attempting to control the affairs of the church. The other action, entitled the *Wilshire Boulevard Congregational Church of Los Angeles, a Corporation,* v. *Frank Dyer,* seeks to have it adjudged that the contract of employment of the defendant as pastor of the church has been canceled or in lieu of such a decree that it be canceled, and to restrain the defendant from occupying the pulpit or acting as pastor of the plaintiff church. We are primarily concerned with the second action which may from time to time for the purpose of convenience in this opinion, be referred to as the Dyer action to distinguish it from what may be called, for like purposes, the trustees' action. The Dyer action seeks the relief already mentioned upon the allegations in the complaint that the plaintiff, acting through its board of trustees, did on January 23, 1928, cancel and terminate the contract by which defendant was employed as its pastor for a term of ten years commencing July 28, 1925, at a salary of not less than $7,500 per annum. Annexed to the complaint is a copy of the constitution of the church wherein it is said in article IV, under the title of government, as follows:

"Its government is vested in the body of believers who compose it.

"It is subject to the control of no other ecclesiastical body, but it recognizes and sustains the obligation of mutual counsel and co-operation which are common among Congregational churches.

"Its organic relation is with the Los Angeles Association of Congregational Churches and the Congregational Conference of Southern California and the National Council of Congregational Churches, and it recognizes its fellowship with all churches which acknowledge Jesus the Christ to be their divine Redeemer and Lord."

It is provided also in article VI of the constitution that the officers of the church shall be "a Pastor, Deacons, Deaconesses, Trustees, clerk, Financial Secretary, Treasurer, Benevolent Treasurer and Sunday School Superintendent," who shall be elected by ballot. Section 2 of this same article says: "The Pastor shall be chosen at a regular meeting called for the purpose by written notice from the pulpit at least one Sunday before such meeting is held, and such choice must receive the votes of at least two-thirds of all the members present at said meeting.

"As soon after settlement as possible, he shall become a member of this church and shall be installed by Ecclesiastical Council when the church and pastor so agree.

"He shall have control of the pulpit, shall ordinarily preside at the meetings of the church, and perform the duties attaching to his office."

The power of the trustees is defined in section 7 of the same article in these words:

"The Trustees shall have the care of the place of worship but shall have no power to buy, sell, mortgage, lease or transfer any property without specific vote of the church authorizing such action.

"They shall provide, under the direction of the church, for the raising of money for its support, shall have general charge of its finances other than moneys contributed at the Lord's Supper, or for any charitable or benevolent objects, shall authorize and direct the Treasurer as to the payment of moneys under their control, and shall provide for the proper auditing of his accounts."

The complaint in the Dyer action also alleges as a reason for its termination of the contract of employment, or as a reason for its termination by the court, various incidents of asserted misconduct on the part of the defendant consisting of undue familiarity with women and of a domineering and autocratic attitude assumed by him in church affairs and toward various of the members of the church.

This proceeding is instituted for the purpose of prohibiting the respondent court from taking any action in either of the causes there pending, but, as we have stated, we are especially interested in the Dyer action for the reason that the order for the alternative writ was limited to that action, except that it did prevent the court from entering a judgmen affecting the pastorate or pastoral relations of the church. The return to the writ denies that the petitioner is a Congregational minister and alleges that by action of the Los Angeles Association of Congregational Churches and Ministers on June 7, 1928, the fellowship of that association was withdrawn from him. There is included in the return an amendment and supplement to the complaint in the Dyer suit in which this action is alleged and the decision withdrawing fellowship from the petitioner is final. It also alleges that during June, 1928, the defendant organized a new super-denominational church, not a Congregational church, and is conducting services for the new church in the edifice of the plaintiff. The return also shows in response to an allegation in the petition that the judge of the respondent court had announced his intention to render judgment against the defendants in both of the actions that he did so announce and that he had prepared findings, a copy of which is set forth in the return, and in which the allegations of the supplement to the complaint of plaintiff are found to be true as well as the allegations to which we have made reference in the complaint itself.

The first question presented for settlement concerns the right of the court to permit the amendment and supplement to the complaint for the purpose, which is stated therein, of conforming to the proof. In our consideration of this phase of the case it should be noted that we are not concerned with whether the court erred in permitting the amendment and supplement to be filed, but whether it had the power to grant the request. ▮ It is the general

rule for which there is an abundance of authority that when the evidence shows that one of the parties to the action is entitled to relief except for a defect in the pleadings an amendment should be allowed or directed by the court in order to make the pleadings conform to the facts proven. Indicative of the extent of the power of the court in this regard is the case of *McClure* v. *Alberti*, 190 Cal. 348 [212 Pac. 204], wherein it is said: "After the evidence was closed, but before decision, the trial court permitted the respondent to amend her third amended complaint and her amended answer to the second amended cross-complaint of the appellants by setting up the mutual abandonment of the written agreement by the parties—the allegation theretofore having been merely that the parties "entered into an oral agreement in alteration of said written agreement.' Appellants sought to demur and to answer to respondent's pleadings as amended, claiming that a new cause of action and a new defense were set up. The demurrers and the answer were stricken from the files. Appellants were not prejudiced by this action. As we read the record, the amendment, in effect, was merely one to conform to the proofs. Assuming that an additional issue was tendered by the amendment, we cannot see how the testimony in the case could have been different from that already introduced. All the facts were before the court, and its findings conclusively establish the liability of the appellants, irrespective of whether the issue was one of an alteration of the written contract or its entire abandonment, and the substitution of the oral agreement." ▮ Undoubtedly also the power of the court is to be exercised in its sound discretion. (21 Cal. Jur., p. 209, sec. 143.) It is obvious from this brief statement of the law anent the subject of amendments to conform to the proof that in this character of a proceeding where we are not possessed of a record of the testimony and where we are inquiring, not into errors of law, but rather into a threatened excess of jurisdiction, that we must unequivocally assert the power of the court to direct or allow the amendment here permitted. ▮ We can see no reason why facts occurring subsequent to the filing of the original complaint should not be made the basis of an amendment or supplement as well as those occurring before, if they were (and it must be so presumed) actually before the court.

It is patent that had the plaintiffs sought leave to file a supplemental complaint before the introduction of the testimony and for the purpose of having it introduced, the court with propriety could have made an order permitting it to be filed. In like manner the evidence having been admitted, the court could properly allow or direct the pleadings to be so changed as to conform to the proof made. This, then, brings us to the question of whether the respondent court has jurisdiction to file the findings and judgment in conformity therewith, which, as we have noticed, corresponds to the amendment and supplement to the complaint.

We shall assume, although it is not necessary to decide, that the board of directors of the church, under the constitution as drafted and adopted, had no authority to dispense with the services of a pastor elected by the congregation, and we shall likewise assume that the civil courts have no power to determine what conduct is sufficiently unbecoming a pastor to warrant his removal from the clerical office. We indulge these presumptions without attempting to discuss or formulate a decision thereon because the opinion we now entertain of the proceedings renders it unnecessary to determine the questions, and yet we would leave no room for a reader to infer subsequently that we entertain an opinion that in the administration of ecclesiastical discipline the civil courts have a right to interfere.

The constitution of the Wilshire Boulevard Congregational Church, as already stated, recites that "Its organic relation is with the Los Angeles Association of Congregational Churches and the Congregational Conference of Southern California, and the National Council of Congregational Churches. . . . ''

In attempting to define its alliance with the Los Angeles Association of Congregational Churches, etc., we have recourse to the generally accepted meaning of the word organic in the domain of jurisprudence, it being here employed in the constitution of the church adopted by its members for their own guidance and government. In this sense when we speak of organic law we generally refer to the fundamental law or constitution of the state or nation (3 Bouvier's Law Dictionary, pp. 24–26). One of the definitions we find in Webster's New International Dictionary is as follows: "Per-

taining to, or inherent in, a certain organization; depending upon the constitution or structure; not secondary or accidental.'' And the same lexicographers say of organic law: ''Designating, or pertaining to, the law or laws by virtue of which a government or organization exists as such; designating the laws incorporated or involved in the organization of a state, political organism, other organized association; fundamental.'' We conclude from these definitions that when the members of this church wrote the quoted portion of their constitution they intended to say that it was the very essence of the organization's being—that purpose for which it was brought into existence—that it enter into relationship with the other Congregational churches and associations; that the church was one of the units constituting the whole structure of Congregationalism in the nation and as such subjected itself to the customs, usages and laws of the denomination as a whole. In such a sense we can with propriety say of a state of the union that it is in organic relation with the other states of the United States, all of which, as so interrelated, constitute a nation.

However, the above definition of ''organic relations'' is not sufficiently complete for our purposes for the reason that the same article says: ''Its government is vested in the body of believers who compose it.''

''It is subject to the control of no other ecclesiastical body, but it recognizes and sustains the obligation of mutual counsel and cooperation which are common among Congregational Churches.'' Undoubtedly the statements we have just quoted must be construed with and made to harmonize with the provision containing the expression, ''organic relations,'' if the same be possible. In this connection it is well to bear in mind that the idea of a self-governing body of disciples linked to one another by a voluntary covenant which transforms them into the visible church has been one of the chief characteristics of Congregationalism since the organization of its first churches in the latter part of the sixteenth century (see article on Congregationalism in vol. IV of The Americana, by Williston Walker, professor of Church History at Yale University, which we have consulted for the purpose of stimulating our judicial knowledge in accordance with the rule for which authority is hereafter cited). We find, therefore, an apparent rather than a real

conflict between the two provisions because if self-government of the individual church be a feature of Congregationalism, then it must logically follow that its customs, usages, and laws will not conflict therewith, and we are returned to our original determination of the meaning of "organic relations," which also finds support in the article already mentioned in its history of the denomination in this country wherefrom it is made to appear that there has always been a close bond of fellowship binding together the various units in a relation of mutual helpfulness, advice, and counsel in matters of importance, such as the settlement or dismissal of a pastor.

With this understanding of the church government it becomes apparent that the respondent court not only has jurisdiction to construe the provisions of the constitution which we have been considering, but also has jurisdiction to determine that the Los Angeles Association of Congregational Churches and Ministers has withdrawn its fellowship from the petitioner and the effect of such action, as to whether it is final and conclusive, as well as its effect upon the petitioner. To this end it is within the power of the court to consider expert testimony and consult standard works of authority upon the subject. In *Arthur v. Norfield Parish Congregational Church Soc.*, 73 Conn. 718, 731 [49 Atl. 241–246], it is said: "What that usage is was a question of fact, as to which the Court of Common Pleas heard expert testimony and consulted standard works of authority upon the customs and ecclesiastical law which govern this religious denomination. The object and justification of any such resort to printed books is the aid which they may be expected to afford to the court in the exercise of the faculty of judicial notice. Congregationalism was for nearly two centuries the established religion of Connecticut and its laws and usages form part of the history of the commonwealth." (See, also, *Frohliger* v. *Richardson*, 63 Cal. App. 209 [218 Pac. 497]; subd. 8, sec. 1875, Code Civ. Proc.) While there seems to be some difference of opinion in the adjudicated cases in other jurisdictions upon the conclusiveness of a decision or determination of an ecclesiastical authority or tribunal (see note to *St. Vincent* v. *Murphy*, 35 L. R. A. (N. S.) 919), such difference cannot alter the outcome of this proceeding for the reason that if

the determination of the Los Angeles Association be final the respondent court has jurisdiction to ascertain its decision and so declare, whereas if the decision of the tribunal be not conclusive upon the court it also has jurisdiction to inquire into the regularity of the proceedings. In either case the respondent court is vested with jurisdiction to determine what the ecclesiastical tribunal has done, and inasmuch as we are not now to inquire into mere errors of law we are not called upon to determine whether the court is exercising its jurisdiction correctly or incorrectly. It is proper, however, to call attention to the fact that our Supreme Court has definitely aligned itself with those authorities which hold that the civil authorities cannot disregard the decisions of the church tribunals. In *Committee of Missions* v. *Pacific Synod*, 157 Cal. 105, at page 128 [106 Pac. 395, 403], it is said: "Lest we be understood to hold that the civil courts can disregard and overrule the decisions of the church authorities acting regularly, in ecclesiastical matters, we expressly disavow that doctrine. We approve the principle laid down by the Supreme Court of the United States in *Watson* v. *Jones*, 80 U. S. (13 Wall.) 726 [20 L. Ed. 666, see, also, Rose's U. S. Notes], and by the Supreme Court of this state in *Horsman* v. *Allen*, 129 Cal. 136 [61 Pac. 796], relating to this subject. 'Whenever the question of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of the church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them' (*Watson* v. *Jones*, 80 U. S. (13 Wall.) 727 [20 L. Ed. 666]). This was said with reference to the Presbyterian Church, and it is declared to be the doctrine applicable to all churches having a similar system of ecclesiastical government." There then follows in this opinion a long list of authorities to which reference may be had supporting the rule. It also seems meet to say, in order to avoid subsequent possible confusion, that *Watson* v. *Jones, supra,* also quotes with approval from authorities to the effect that the supervisory power of the civil tribunals may not be invoked when the only property involved is the loss of clerical office and the salary incident thereto. ■ Having deter-

mined that the respondent court has the authority to determine what the ecclesiastical tribunal decided, it also follows that it has the jurisdiction to determine whether one who has been deprived of the fellowship of the Los Angeles Association of Congregational Churches and Ministers can or cannot act or claim to act as pastor of one of the units constituting the Los Angeles Association. In fact, petitioner himself calls attention to the Law of Congregational Usage by William E. Barton at page 235, wherein we find this statement: "An ordination requires the concurrent action of the churches of the vicinage. Such concurrence is appropriate but not indispensable in the settlement of a minister already ordained."

There is another prepared finding of the court which also seems to render it necessary for us to deny the writ. The supplement to the complaint and the finding prepared responsive thereto is that the petitioner did during June, 1928, organize a new super-denominational church, not a Congregational church, and is conducting services for the new church in the edifice of the Wilshire Boulevard Congregational Church. As long ago at least as 1820 in the case of *Baker* v. *Fales,* 16 Mass. 488, it was determined that where a majority of the members of a Congregational church separate from the majority of the parish, the members who remain, although a minority, constitute the church in such parish, and retain the rights and property belonging thereto. This opinion is supported by sound logic as is obvious when we consider that the property of the church has been set aside and dedicated to the particular benevolent purpose of the church in question, and that when any number of members see fit to forsake its covenant, they cannot take protesting and faithful members with them. Nor is the rule without former recognition in our own jurisdiction. In the two cases of *Horsman* v. *Allen, supra,* and *Christian Church of Vacaville* v. *Crystal,* 78 Cal. App. 1 [247 Pac. 605], the general doctrine receives approval. It cannot be doubted that the respondent court has the jurisdiction to determine as a fact the separation, nor is it doubted that the court has jurisdiction when it determines the separation to exist to declare that the petitioner has by this action forsaken his pastorate and that the property of

the church is under the control of its members who have remained loyal.

The peremptory writ is denied.

Works, P. J., and Craig, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on November 5, 1928, and petitioner's application to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 6, 1928.

All the Justices concurred.