[Civ. No. 14701. Fourth Dist., Div. One. Jan. 19, 1977.]

SAMOAN CONGREGATIONAL CHRISTIAN CHURCH IN THE UNITED STATES, Plaintiff and Appellant, v.
SAMOAN CONGREGATIONAL CHRISTIAN CHURCH OF OCEANSIDE et al., Defendants and Respondents.

70

COUNSEL

William F. Gavin for Plaintiff and Appellant.

Wright & Panther and Saul D. Wright for Defendants and Respondents.

OPINION

STANIFORTH, J.—The Samoan Congregational Christian Church in the United States, plaintiff, brought this action to impress a trust upon and to forfeit all assets of defendant Samoan Congregational Christian Church of Oceanside, a California nonprofit religious corporation. The complaint alleges the defendant church (Samoan Oceanside Church) had "illegally" attempted to oust its minister, the Reverend Talani Fuimaono, from his post and install another, the Reverend Talo Poumele, in his stead. These acts were in opposition to its general assembly, the supreme authority within the plaintiff organization. The Samoan Oceanside Church relies upon its corporate status, its articles of incorporation and bylaws to justify its position.

Upon trial without jury, the court concluded that all matters of an ecclesiastical nature, including the appointment or removal of a minister, were under the jurisdiction of the ruling elders of the church in Samoa, acting through its general assembly, the supreme authority in the United States; however, the ownership, control, possession and use of the assets of the Samoan Oceanside Church as a nonprofit religious corporation were vested in its board of directors acting in accordance with its

corporate articles, bylaws and pertinent sections of the California Corporations Code. The trial court thereupon concluded that the Samoan Oceanside Church assets were not impressed with a trust for the benefit of plaintiff. This appeal followed.

The record reflects that the Samoan Oceanside Church is one of 23 churches in the United States that make up a general denomination of churches known as the Samoan Congregational Christian Churches in the United States. Plaintiff is the unincorporated association of these 23 churches with its headquarters in San Diego, California. This association consists of a single district for the territory of the United States, separated into subdistricts, three of which are located within California. The Samoan Oceanside Church is a member of the southern California subdistrict. The highest ecclesiastical authority over defendant church in the United States is denominated the "district" organization acting by and through its general assembly. Ultimate authority in religious matters rests with the mother church in Samoa acting through the ruling committee of elders.

This evidence concerning the organizational structure of the Samoan Congregational Church in the United States, the interrelationships in the religious sphere between the member church and the district and/or the mother church in Samoa comes by oral testimony from one Reverend Elder Suitonu, member of the ruling committee of elders and minister of the San Diego Samoan Congregational Christian Church. No written constitution or other fundamental documentation of any class or kind was produced by plaintiff at trial to aid the court in determining the question of whether the defendant Samoan Oceanside Church was of what is known as congregational polity or of the hierarchical polity of churches.[1]

The defendant Samoan Oceanside Church was organized as a California nonprofit religious corporation by the filing of its articles of incorporation and bylaws on March 4, 1963. It has acted as a functioning religious body since that date. It was founded with the aid, help and direction of the San Diego Samoan Congregational Church and the Reverend Elder Suitonu, who authorized and directed members of the

---

[1]See *Md. & Va. Churches* v. *Sharpsburg Ch., infra,* 396 U.S. 367, 369, fn. 1 [24 L.Ed.2d 582, 584, 90 S.Ct. 499, 500], for the distinguishing characteristics of these two classes of religious organizational frameworks.

church in San Diego to transfer their membership to the newly formed Oceanside church. The bylaws here relied upon by defendant were brought into being with the aid of the Reverend Elder Suitonu. The assets here in dispute belong in title and possession to the corporate defendant. They are the fruits of work, labor and gifts of the membership of the Samoan Oceanside Church. The sole exception is a $1,000 donation made by the Reverend Suitonu's San Diego church at the time of defendant's formation.

The present dispute erupted when defendant, by and through its board of directors, discharged the Reverend Talani Fuimaono as its minister and appointed the Reverend Talo Poumele in his place. This action was disapproved by the Reverend Elder Suitonu and by the plaintiff association meeting in general assembly. The Reverend Talo Poumele and other deacons and laymen associated with him in this disobedience are no longer recognized by the supreme authorities.

We turn now to an analysis of plaintiff's broad assertion, to wit: the Samoan Oceanside Church holds all its properties and assets in trust for the benefit of plaintiff and all its members who are loyal to the parent church organization. This contention rests upon the premise that the higher church authority—the district organization meeting in general assembly—can bind, control and direct a member church in the area of hiring or firing of its pastor. Plaintiff's ultimate contention relies, secondly, upon the assumption that control over the selection of or discharge of a minister carries with it a species of obligation of trust with respect to the assets of the church served by the pastor. These premises are hotly disputed.

There is no evidence of language in any document, or in the articles or bylaws of the corporate defendant, which creates any express trust for the benefit of plaintiff or those loyal to plaintiff.

Plaintiff, however, asserts the legal proposition that the assets of a California religious nonprofit corporation are "held upon a trust" (Corp. Code § 10206, subd. (c)). ▮ It is true that the assets of the religious nonprofit corporation are deemed to be impressed with a charitable trust deriving from the express declaration of corporate purpose. This is a fact, notwithstanding the lack of any express declaration of purpose by the donors of such as assets (*Pacific Home* v. *County of Los Angeles*, 41

Cal.2d 844, 852 [264 P.2d 539]; *Wheelock* v. *First Pres. Church*, 119 Cal. 477, 483 [51 P. 841]). The properties of a religious nonprofit corporation are held upon a trust " 'to carry out the objects for which the organization was created' " (*Lynch* v. *Spilman*, 67 Cal.2d 251, 260 [62 Cal.Rptr. 12, 431 P.2d 636]).

These broad principles of law do not dispose of the specific question lodged in the facts of this case. It is rather within the case of *Watson* v. *Jones* (1872) 80 U.S. (13 Wall.) 679 [20 L.Ed. 666], and its lineal descendants, and more specifically its distinguishing progeny, which control and determine the disposition of properties of a religious corporation such as defendant. *Watson, supra,* was a diversity decision decided before the application of the First Amendment principles to the states, but was nonetheless "informed by First Amendment considerations." In *Watson* the civil court was requested to resolve a property dispute existent between the national Presbyterian organization and a local member of that national body. *Watson,* as in the case at bench, involved a dispute arising out of church doctrine with the request for termination of an implied trust as regards assets because of a "departure from doctrine" by the member church. The *Watson* court refused. In discussing the role of the civil court as the forum for resolving property disputes arising within a church, *Watson, supra,* at page 726 [20 L.Ed. at page 676], speaks of a "third" class of cases where the property is acquired in any of the usual modes for the general use of a religious congregation which is itself part of a larger and general organization of some religious denomination and with which it is more or less intimately connected by religious views and ecclesiastical government. Of this "third" class of cases, *Watson* said, at pages 726-727 [20 L.Ed. at page 676]: "[B]ut in cases of this character we are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments."

A spiritual descendant of *Watson, supra,* relying upon the last-quoted language, is *Wheelock* v. *First Pres. Church, supra,* 119 Cal. 477, cited by plaintiff here. *Wheelock* involved a dispute over the directives of the Presbytery, a church tribunal having control and supervision of the Presbyterian Church in Los Angeles. The questioned order directed the member church to separate into two bodies and mandated a division of assets. Plaintiff contends *Wheelock* stands for the proposition that " 'the

title to the property of a divided church is in that part of the organization which is acting in harmony with its own law,' " quoting from *White Lick etc.* v. *White Lick etc.,* 89 Ind. 136. Plaintiff correctly quotes *Wheelock* and the recited language admits of the construction placed upon it; yet *Wheelock* states further, at page 482: "It may be conceded, for the purposes of the case, that neither the Presbytery nor the commission appointed by it had the power to divide and apportion the money held by the church corporation; and that the disposition of those moneys were matters for civil courts, and that ecclesiastical decrees bearing upon such disposition are not binding upon judicial tribunals." Further, at page 486, *Wheelock* holds: "A corporation composed simply of the trustees, or of all the members, is still a body separate and distinct from the church proper . . . . The two bodies are as separate and distinct as though the trustees alone constituted the corporation. . . . The Presbytery had the power to deal with the church, and the court certainly has the power to deal with the property . . . ." Thus neither the last-quoted language nor the precise holding of *Wheelock, supra,* gives plaintiff any solid comfort.

A second and distinct line of cases also derive authority from *Watson, supra.* However, these intellectual descendants emphasize the language of the *Watson* case which has the "clear constitutional ring." These cases see First Amendment considerations dictating the language of *Watson* at page 728 [20 L.Ed. at page 676]: "In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." Citing this language of *Watson, supra, Presbyterian Church* v. *Hull Church,* 393 U.S. 440 at page 447 [21 L.Ed.2d 658 at page 664, 89 S.Ct. 601] says: "The logic of this language leaves the civil courts *no* role in determining ecclesiastical questions in the process of resolving property disputes." *Hull Church, supra,* does not declare an absolute however, but rather recognized that the role of the civil court is "severely circumscribed" when it is called upon to resolve church property disputes. The Supreme Court in *Hull Church* then delineated the appropriate scope of court activity, stating on page 449 [21 L.Ed.2d at page 665]: "And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over

religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. . . . *[T]he Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.*" (Italics ours.)

Most recently, in *Md. & Va. Churches* v. *Sharpsburg Ch.,* 396 U.S. 367, 369-370 [24 L.Ed.2d 582, 584, 90 S.Ct. 499, 500-501], *apropos* of the question here under scrutiny, Justice Brennan, in a concurring opinion, said: "To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine. Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy. In other words, the use of the *Watson* approach is consonant with the prohibitions of the First Amendment only if the appropriate church governing body can be determined without the resolution of doctrinal questions and without extensive inquiry into religious polity."

California case law, post-*Hull Church, supra,* has overtly recognized First Amendment applications in this delicate area of disputed church property. In *In re Metropolitan Baptist Church of Richmond, Inc.* (1975) 48 Cal.App.3d 850 [121 Cal.Rptr. 899], the teachings of *Hull Church, supra,* are set forth. Approval is made of the language of the leading case of *Polen* v. *Cox,* 259 Md. 25, 30 [267 A.2d 201, 204], wherein the Maryland High Court articulated the constitutional touchstone to be whether: " . . . the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution *by the court* of ecclesiastical issues. . . . [A]s long as the court does not have to resolve the doctrinal propriety [of a church's action] in order to determine who has legal control of the property, there is no unconstitutional intervention by the state in church affairs." Earlier California cases (pre-*Hull Church, supra*) have entertained jurisdiction over church property disputes even though some ecclesiastical matters were incidentally or marginally involved. (See *Providence Baptist Church* v. *Superior Ct.*

(1952) 40 Cal.2d 55, 60 [251 P.2d 10]; *Rosicrucian Fellow.* v. *Rosicrucian etc. Ch.,* 39 Cal.2d 121, 131 [245 P.2d 481].) *Providence Baptist Church* v. *Superior Ct., supra,* which was decided in the same year when the principle of *Watson, supra,* was metamorphosed by the evolutionary process into a constitutional principle in the case of *Kedroff* v. *St. Nicholas Cathedral* (1952) 344 U.S. 94 [97 L.Ed. 120, 73 S.Ct. 143]. Although prior to the unmistakable direction given by *Hull Church, supra, Providence Baptist Church, supra,* pays heed sub silentio to First Amendment considerations when holding, at pages 63-64: "If the problem was whether the pastor was preaching a theology contrary to the denominational doctrine or conducting religious services in a manner out of harmony with the ritual of the church, it would clearly not be within the province of a court to interfere, and the controversy would have to be settled by the church tribunals. But where, as here, the question presented is whether the property and funds of the church are being handled in accordance with the by-laws and rules of the church corporation or such by-laws and rules are being properly observed by the governing body of the church, those aggrieved may seek redress through court action." Thus California law, although not precisely dealing with the question here presented, is substantially in accord with the *Hull Church* decision.

■ The foregoing review of the pertinent case law compels the conclusion that plaintiff asks the court to enter upon a constitutionally impermissible probing into both the "identity of the governing body or bodies that exercise general authority within a church" and into the allocation of power within a church organization so as to decide "where religious law places control over the use of church property." We are prohibited from such an undertaking.

Whether it be pursuant to First Amendment command or by choice of "the neutral principles of law developed for use in all property disputes," we now examine the corporate articles, bylaws and pertinent state law to resolve this property dispute. The trial court examined the tendered documents and determined their force and effect without resort to conflicting extrinsic evidence. This court can and does therefore make "an independent interpretation" thereof (*Estate of Dodge,* 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385]).

The articles of incorporation of the Samoan Oceanside Church vest control thereof in its board of directors.

Article 3 of the bylaws, dealing with the matter of church polity, provides: "The government of this Church is vested in its members who exercise the right of control in all its affairs, subject in legal matters to the provisions of its Articles of Incorporation.

"·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"While this Church is amenable to no ecclesastical [*sic*] authority, it accepts the obligations of mutual councel [*sic*], comity and cooperation in the free fellowship of the Congregational-Christian Churches, and pledges itself to share their common aims and work."

The board of directors (trustees) consists of nine members selected by the membership of the church. Their duties include the obligation to preserve and administer the temporalities of the church. The directors and members of the church are specifically prohibited from having "any personal, proprietary, or beneficial interest in the property of this corporation either during its corporate existence, or upon its dissolution, save and except as is provided by the general non-profit corporation laws of the State of California." The bylaws specifically vest control of the Samoan Oceanside Church, its business and financial affairs, in its board of directors. The board shall have "care and custody of the real and personal property of the church." Their control is "subject to the laws of the State." The board has no power to buy, sell, lease or transfer property without specific authority given by the Samoan Oceanside Church (art. VIII, § 4, Bylaws). Upon dissolution, the assets of the corporation are to be transferred to the Congregational Conference of Southern California and the Southwest (art. XV, Bylaws).

■    A fair reading of the submitted documents leads to the conclusion there is no intent whatsoever to create either an express or implied trust on behalf of plaintiff or those members who are loyal to the parent church. Rather, the rational inferences can be drawn that the board of directors of the corporation has control of its assets, with ownership vested in the corporation. Disposition of those assets is governed by the laws of the State of California relating to nonprofit religious corporations.

Corporations Code section 10206, subdivision (d) expressly limits the powers of a board of directors in disposition of assets received by it.

These assets are impressed as a matter of law with the trust purposes. We do therefore conclude that the neutral documents create no trust rights with plaintiff as beneficiary in the assets of defendant corporation.

In denying plaintiff's claim, we do not here determine who is entitled to the property or portions thereof of a California religious nonprofit corporation in disputatious circumstances as here. In a companion case decided this date, *Fuimaono* v. *Samoan Congregational etc. Church of Oceanside, post,* page 80 [135 Cal.Rptr. 799], this question is addressed and resolved.

The judgment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.