[Civ. No. 19079. Fourth Dist., Div. Two. Feb. 27, 1979.]

PRESBYTERY OF RIVERSIDE et al.,
Plaintiffs, Cross-defendants and Appellants, v.
COMMUNITY CHURCH OF PALM SPRINGS,
Defendant, Cross-complainant and Respondent.

912

## COUNSEL

Thompson & Colegate, James D. Ward and Jim D. Bishop for Plaintiffs, Cross-defendants and Appellants.

Schlecht & McCullough and John C. Shevlin for Defendant, Cross-complainant and Respondent.

## OPINION

KAUFMAN, J.—Community Church of Palm Springs (hereafter Community Church or local church) was for many years affiliated with United Presbyterian Church in the United States of America[1] (hereafter UPCUSA or general church). In 1968, after unsuccessfully attempting to negotiate a mutually agreeable termination of the relationship, Community Church unilaterally terminated its affiliation with UPCUSA. UPCUSA claims ownership and the right to possession of all of the real and personal property standing in the name of Community Church and possessed by it on the date it terminated its affiliation with UPCUSA. Eliminating procedural complexities of no significance to the appeal, plaintiffs, which are components of UPCUSA, instituted this action against Community Church for ejectment, recovery of property, quiet title and damages for the value of the use of the property at $4,000 per

---

[1]UPCUSA is the successor to the Presbyterian Church in the United States of America.

month since June 30, 1968. Community Church answered, denying plaintiffs' claims of ownership and right to possession and alleging several affirmative defenses. It also cross-complained against plaintiffs to quiet its title to the property in dispute. The trial court determined that Community Church is the owner of the property and rendered judgment quieting its title. Plaintiffs appeal.

Appellants contend that the highest judicatories of UPCUSA determined that the property in question belongs to the general church and that the courts of California are compelled by decisions of the United States Supreme Court, decisions of the California Supreme Court and the dictates of the First Amendment to the United States Constitution to accept and enforce the rulings of these ecclesiastical bodies; that as a matter of law a member church in a general church organization of hierarchical structure holds title to its property in trust for the general church organization; that, in any event, Community Church holds title to the property in question as trustee of an express trust or a trust implied in fact for the benefit of the general church; that the judgment rendered in the court below would deprive the general church of its property without due process of law; and that the trial court's conclusion that plaintiffs were estopped to assert that Community Church holds title to the disputed property in trust for the benefit of the general church is erroneous as a matter of law. For the reasons that follow we have concluded that all of these contentions save the last, which we do not reach, are without merit.

No contention is made that the trial court's findings of fact are not supported by substantial evidence, and most of the pertinent facts are included in the findings. UPCUSA is a voluntary religious association the components of which constitute one united church, connectional in nature. It is organized in a hierarchical structure of ascending representational levels of ecclesiastical authority called judicatories. That part of its constitution dealing with its system of government is designated "The Book of Order."

Each local church is governed by a body called the session. A session consists of the pastor and the ruling elders elected by the congregation. In turn, the local churches within specified geographical areas are organized into presbyteries. A presbytery consists of all the ministers in the geographical area and at least one ruling elder from each individual church. Each presbytery supervises the churches within its area and has

the authority to, among other things, organize and dissolve churches, remove pastors from their pulpits, and suspend the powers of a session. When the powers of a session have been suspended by a presbytery, the presbytery also has the authority to elect an administrative commission to assume control over the life of the church. Palm Springs is within the territorial jurisdiction of the Presbytery of Riverside.

The next higher judicatory in the system is the synod, which consists of a number of presbyteries, usually all of those in a state. The Synod of Southern California exercises ecclesiastical control over seven presbyteries in Southern California and the State of Hawaii, including the Riverside Presbytery.

Ultimate authority rests in the General Assembly, the commissioners of which are elected annually by the various presbyteries.

The Book of Order requires the formation of a corporation at each level of authority to hold, manage and transfer property and to facilitate the management of its civil affairs. Thus, as is typical, there is a corporation named the Presbytery of Riverside and, in addition, an unincorporated association known as the Presbytery of Riverside. Both are plaintiffs in this action and will hereafter be referred to collectively as Presbytery unless differentiation between the two is significant.

Defendant Community Church of Palm Springs is a nonprofit California corporation incorporated in 1948 by members of an unincorporated association which for a number of years prior to 1917 had maintained in Palm Springs the church known as the Community Church of Palm Springs. In 1917 the unincorporated association became affiliated with the Presbyterian denomination and thereupon took the name Palm Springs Presbyterian Church. However, shortly thereafter the association discontinued use of the designation Presbyterian and was known simply as the Community Church of Palm Springs or, after incorporation, the Community Church of Palm Springs (Presbyterian). For many years Community Church was the only Protestant church in the community of Palm Springs.

From 1917 until 1967 the pastors of Community Church were placed in the pulpit by the judicatories of UPCUSA, and the pastors and session of Community Church regularly participated in the activities of Presbytery.

Members of the session took an oath of office pledging adherence to the doctrine and discipline of the Presbyterian denomination.

Since its inception Community Church has invited to membership persons from all Protestant denominations without any requirement of termination of membership in any other church or denomination and has held itself out as being an interdenominational community church. Persons who joined or attended Community Church who were of Presbyterian background were frequently outnumbered by persons who were members of other denominations. Although for a period of approximately 10 years prior to 1966 each new member was given an application that included a statement that Community Church was affiliated with the Presbyterian denomination, many members were unaware of the affiliation of Community Church with the Presbyterian denomination. Although some of its publications indicated Community Church's Presbyterian affiliation, a substantial majority of such material described Community Church as an interdenominational and nondenominational church open to all Protestants.

With the exception of a small amount of money received from the Presbytery of Riverside early in Community Church's history, all funds used to purchase and improve properties of Community Church came from its members or nonmember individuals residing in or visiting the desert area of Riverside County, and not from or through the efforts of plaintiffs. Since 1928 and until recent years, Community Church raised money for its operating budget by soliciting donations from residents of the Palm Springs community of different religious faiths who were approached on the basis of helping to maintain a nondenominational community church. Community Church conducted two major capital fund raising drives during the periods 1957 through 1960 and 1961 through 1963 for the purpose of raising funds to construct major facilities. Those campaigns were conducted and those funds solicited on the representation that Community Church was an interdenominational and nondenominational community Protestant church. Many members, officers and trustees of Community Church would not have sought membership nor solicited funds for Community Church's operating budget or building fund drives had they known that UPCUSA and Presbytery claimed ownership of Community Church's properties.

In about 1967, disputes arose between Community Church and UPCUSA due to several doctrinal changes and a mandate for social

action adopted by the General Assembly. As a result, Community Church petitioned the Presbytery of Riverside to appoint a commission to negotiate with Community Church a mutually agreeable termination of the local church's affiliation with the general church, including an amicable resolution of any question as to ownership of property in the name and possession of Community Church. The General Council of the Presbytery of Riverside recommended that Community Church's request be denied "in order that the witness of the United Presbyterian Church in the U.S.A. might be maintained in Palm Springs." On September 23, 1967, Presbytery adopted the council's recommendation.

Community Church appealed by filing a complaint against the Presbytery with the Synod of California. The complaint was referred to the new Synod of Southern California for adjudication. The Synod referred the complaint to its Judicial Commission. On March 4, 1968, the Judicial Commission sustained the action of the Presbytery.

Thereafter Community Church appealed by filing a complaint with the 180th General Assembly which referred the matter to its Permanent Judicial Commission. The commission found that the complaint was a proper one for consideration by it but rendered a "preliminary judgment" that the complaint not be sustained. However, it expressly authorized Community Church to present to the 1969 General Assembly its request to withdraw with its property.

Pending presentation of the matter to the 1969 General Assembly, Presbytery attempted to take possession of the physical assets of Community Church, and in early 1968, the congregants of Community Church, by an overwhelming majority, voted to withdraw from the general church. On May 28, 1968, the session of Community Church adopted a resolution to withdraw from the Presbyterian denomination, and on June 8, the session sent a letter to Presbytery renouncing Presbytery's jurisdiction over Community Church. In addition, a representative of the session was sent to the June 8 meeting of Presbytery to deliver a copy of the session's resolution to withdraw. At its June 8 meeting, Presbytery acted to suspend the powers of the Community Church session, effective June 30, 1968, elected persons to comprise an administrative commission and empowered the administrative commission to act as the session of the "Palm Springs Presbyterian Church." Although not originally named as such, the Administrative Commission

of the Presbytery of Riverside was subsequently joined as a party plaintiff in this action.

On July 1, 1968, pursuant to a resolution of its board of trustees on June 18, Community Church amended its articles of incorporation to, among other changes, eliminate "(PRESBYTERIAN)" from its name.

In 1969, Community Church attempted to present to the 181st General Assembly its request to withdraw with its property. However, its request was never considered or decided on the merits because the committee on bills and overtures determined that the "petition is filed by an independent body which has renounced the jurisdiction of the United Presbyterian Church in the United States of America," and was therefore "not filed by a proper petitioner and cannot be considered. . . ."

Pervading almost all of appellants' contentions and central to the appeal are their arguments that the judicatories of UPCUSA have determined that the property in dispute is that of the general church and that the trial court was bound to accept the decision of the religious tribunals as binding and conclusive. Not so.

In the first place, there is a serious question whether the issue of ownership of the disputed property was ever finally determined on its merits by the judicatories of UPCUSA. Community Church's appeal to the 180th General Assembly was found to be proper and the adverse decision of the Permanent Judicial Commission was expressly denominated only a "preliminary judgment." Permission was expressly granted Community Church to present the question to the 181st General Assembly in 1969, but when Community Church attempted to do so, its request was rejected not on the merits but on the ground that it could not be considered because it was filed by an independent body which had renounced the jurisdiction of UPCUSA.

Secondly, and more fundamentally, appellants misapprehend the law. It is true "that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest . . . church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." (*Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 727 [20 L.Ed. 666, 676]; accord: *Serbian Orthodox Diocese* v. *Milivojevich,* 426 U.S. 696, 710, 713, 714 [49 L.Ed.2d 151, 162-163,

165-166, 96 S.Ct. 2372]; *Horsman* v. *Allen*, 129 Cal. 131, 138 [61 P. 796]; see *Committee of Missions* v. *Pacific Synod*, 157 Cal. 105, 128 [106 P. 395]; *Samoan Congregational etc. Church in U.S.* v. *Samoan Congregational etc. Church of Oceanside*, 66 Cal.App.3d 69, 75-76 [135 Cal.Rptr. 793]; *In re Metropolitan Baptist Church of Richmond, Inc.*, 48 Cal.App.3d 850, 858 [121 Cal.Rptr. 899]; cf. *Kreshik* v. *St. Nicholas Cathedral*, 363 U.S. 190 [4 L.Ed.2d 1140, 80 S.Ct. 1037]; *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 115 [97 L.Ed. 120, 136, 73 S.Ct. 143].) However, when the dispute to be resolved is essentially ownership or right to possession of property, the civil courts appropriately adjudicate the controversy even though it may arise out of a dispute over doctrine or other ecclesiastical question, provided the court can resolve the property dispute without attempting to resolve the underlying ecclesiastical controversy. (*Eldership* v. *Church of God at Sharpsburg*, 396 U.S. 367 [24 L.Ed.2d 582, 583, 90 S.Ct. 499]; *Presbyterian Church* v. *Hull Church*, 393 U.S. 440, 449 [21 L.Ed.2d 658, 665, 89 S.Ct. 601]; *In re Metropolitan Baptist Church of Richmond, Inc., supra*, 48 Cal.App.3d at pp. 858-859; see *Serbian Orthodox Diocese* v. *Milivojevich, supra*, 426 U.S. at pp. 709-710 [49 L.Ed.2d at p. 163, 96 S.Ct. 2372]; *Samoan Congregational etc. Church in U.S.* v. *Samoan Congregational etc. Church of Oceanside, supra*, 66 Cal.App.3d at pp. 75-77; cf. *Wheelock* v. *First Presb. Church*, 119 Cal. 477, 482 [51 P. 841].)

The rule was definitively stated in *Presbyterian Church* v. *Hull Church, supra*: "[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. . . . [T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relation-

ships involving church property so as not to require the civil courts to resolve ecclesiastical questions." (393 U.S. at p. 449 [21 L.Ed.2d at p. 665]; accord: *Eldership* v. *Church of God at Sharpsburg, supra,* 396 U.S. 367 [both *per curiam* and conc. opns.]; *In re Metropolitan Baptist Church of Richmond, Inc., supra,* 48 Cal.App.3d 850.)

Contrary to appellants' argument, the more recent *Serbian Orthodox* decision is not to the contrary. The central issues in that case were the identity of the "true Diocesan Bishop" and the propriety of the reorganization by the general church of a single diocese into three dioceses. (426 U.S. at pp. 707-708 [49 L.Ed.2d at pp. 161-162].) The court expressly found that the identity of the true Bishop was essentially a religious question although it incidentally affected control of property. (426 U.S. at pp. 709, 717 [49 L.Ed.2d at pp. 162-163, 167].) It also expressly determined that the reorganization of the diocese involved a religious dispute, stating: "[It] involves a matter of internal church government, an issue at the core of ecclesiastical affairs. . . ." (426 U.S. at p. 721 [49 L.Ed.2d at p. 170].) Thus the court held the decisions of the ecclesiastical tribunals final and conclusive. However, the court expressly quoted with approval the above-quoted language from *Presbyterian Church* v. *Hull Church.* (426 U.S. at pp. 709-710 [49 L.Ed.2d at p. 163].)

The seminal decision, *Watson* v. *Jones, supra,* 80 U.S. (13 Wall.) 679, a pre-*Erie R. Co.* v. *Tompkins* diversity decision decided before the application of the First Amendment to the states (see *Presbyterian Church* v. *Hull Church, supra,* 393 U.S. at p. 445 [21 L.Ed.2d at p. 663]), must now be viewed in the perspective of the later decisions in *Presbyterian Church* v. *Hull Church, Eldership* v. *Church of God at Sharpsburg,* and *Serbian Orthodox Diocese* v. *Milivojevich.* (See *Samoan Congregational etc. Church in U.S.* v. *Samoan Congregational etc. Church of Oceanside, supra,* 66 Cal.App.3d at p. 74 et seq.) However, again contrary to appellants' arguments, the decision in *Watson* v. *Jones* even in its pristine state did not preclude civil courts from adjudicating church disputes that are essentially property disputes only incidentally involving or arising out of ecclesiastical disputes. In *Watson* v. *Jones* the court was asked to decree the termination of an implied trust because of alleged departures from doctrine by the general church. (See *Presbyterian Church* v. *Hull Church, supra,* 393 U.S. at p. 445 [21 L.Ed.2d at p. 663].) Thus the dispute involved in the case was purely ecclesiastical. The court would have been required to determine what the orthodox doctrine was, what changes in doctrine had been made, and whether such changes as were found

constituted such substantial or fundamental departures from the orthodox doctrine as to constitute a violation of the trust. (See *Presbyterian Church v. Hull Church, supra,* 393 U.S. at pp. 449-450 [21 L.Ed.2d at p. 666].) Thus the court was called upon "to determine matters at the very core of a religion—the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." (*Presbyterian Church v. Hull Church, supra.*) Therefore, although the court in *Watson v. Jones* purported to speak of "questions . . . concerning the rights to property held by ecclesiastical bodies" and to divide them into three classes (80 U.S. at pp. 722-723 [20 L.Ed. at p. 674]), the case clearly involved an essentially ecclesiastical dispute.

We find nothing of significance indicating a contrary rule in *Committee of Missions v. Pacific Synod, supra,* 157 Cal. 105, *Horsman v. Allen, supra,* 129 Cal. 131, or *Wheelock v. First Presb. Church, supra,* 119 Cal. 477. The essential question in the *Pacific Synod* case was the validity of a merger between the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church. (157 Cal. at p. 110.) The court expressly stated: "The regularity and validity of the union of that church with another of the same faith and form of government was essentially a question of ecclesiastical law." (157 Cal. at p. 129.) Strangely, even though the court expressly approved the principle laid down in *Watson v. Jones* that civil courts are bound by decisions of ecclesiastical tribunals in ecclesiastical disputes (157 Cal. at p. 128), the court stated: "We have preferred to decide the case . . . without regard to the decisions of the general assembly . . . upon these questions. We have supposed that this would be more satisfactory to the parties concerned." (157 Cal. at pp. 127-128.) In any event the dispute was clearly ecclesiastical.

Although the immediate purpose of the action in *Horsman v. Allen* was to determine the respective rights of the parties to the use and control of two tracts of land, the determining question was which of two sets of trustees elected by two religious bodies, both claiming to represent the true Church of the United Brethren in Christ, represented the "true" church. As the court stated: "The sole question, therefore, is as to the identity of the church. If the radical is the true church, the plaintiffs are entitled to recover; otherwise not." (129 Cal. at p. 135.) Thus the controlling question was clearly ecclesiastical.

In *Wheelock v. First Presb. Church, supra,* 119 Cal. 477, the congregation of the First Presbyterian Church of Los Angeles divided into two

factions. One faction petitioned the governing presbytery to divide the church into two and to make an equitable division of a fund of money that had been accumulated to purchase a new church site. The presbytery and a commission appointed by it did so. The court upheld the action of the presbytery, indicating that the division of the church into two was an ecclesiastical matter. The court did not definitively determine the nature of the dispute insofar as apportionment of the accumulated fund was concerned. It stated: "It may be conceded, for the purposes of the case, that neither the Presbytery nor the commission appointed by it had the power to divide and apportion the money held by the church corporation; and that the disposition of those moneys were matters for civil courts, and that ecclesiastical decrees bearing upon such disposition are not binding upon judicial tribunals." (119 Cal. at p. 482.) The court then proceeded to apply general principles of trust law and concluded that the fund of money should be apportioned on the same basis as that suggested by the presbytery and its commission. (119 Cal. at pp. 483-484.) ■ **(See fn. 2.)** Thus the court in fact determined the apportionment question by the application of "neutral principles of law." (See fn. 2, *infra,* and preceding and following text.)

■ It is unquestionably true that the present dispute over the ownership and right to possession of the property held by Community Church arose out of an underlying controversy involving largely questions of religious doctrine. However, the dispute to be decided by the court in this case is essentially a property dispute; the only relationship between the religious controversy and the dispute in the case at bench is that the latter arose out of the former; the property dispute may be resolved without the necessity of becoming involved with or attempting to resolve the underlying ecclesiastical controversy; and the trial court acted with propriety in determining the case on the basis of "neutral principles of law" and the "formal title" doctrine.[2] As observed by the court in *In re Metropolitan Baptist Church of Richmond, Inc., supra,* 48 Cal.App.3d at page 859; ■ " 'The relevant inquiry must be whether the court can resolve the property dispute on the basis of neutral principles of law which do not involve the resolution *by the court* of ecclesiastical issues. . . . [A]s long as the court does not have to resolve the doctrinal propriety [of a church's action] in order to determine who has legal control of the property, there is no unconstitutional intervention by the state in church affairs.' " (Orig. italics.)

---

[2]The expression "neutral principles of law" apparently originated in the decision in *Presbyterian Church* v. *Hull Church, supra,* 393 U.S. at page 449 [21 L.Ed.2d at page 665]. The expression " 'formal title' doctrine" was used in the celebrated concurring opinion of

Appellants' attempt to analogize the dispute in the case at bench to those confronting the courts in the *Serbian Orthodox, Horsman* and *Wheelock* cases and to characterize it as essentially ecclesiastical is unavailing. As already indicated, the controlling questions in those cases turned on disputes directly involving religious doctrine or church polity, organization or structure. Appellants' arguments are apparently based on the authority of the Presbytery to fill the pulpit of Community Church and to suspend the powers of its session, on Presbytery's determination that the Administrative Commission selected by it is the proper body to control the life of Community Church and on the conclusion that the question presented is whether plaintiff Administrative Commission or the corporate defendant constitutes the "true" governing body of a local church within UPCUSA. However, this reasoning disregards a number of essential facts. When Presbytery acted on June 8, 1968, to suspend the powers of the Community Church session effective June 30, 1968, Community Church had already terminated its relationship with UPCUSA and withdrawn from the Presbyterian denomination. It is undisputed that a local church within UPCUSA may withdraw and terminate its affiliation. The only dispute here concerns ownership and right to possession of property in the name and possession of the local church when that right is exercised. There is no question in this case as to which body is the true Presbyterian church in Palm Springs. Community Church has renounced its affiliation with the Presbyterian denomination and does not claim to be a Presbyterian church or the representative of UPCUSA in Palm Springs. Community Church freely acknowledges that Presbytery and the Administrative Commission control the life of the Presbyterian church in Palm Springs. In truth, there is no existing religious or ecclesiastical controversy. There was one, it is true, which gave rise to the present dispute over the property in the name and possession of Community Church, but in resolving the property dispute it is not required that the court involve itself in or attempt to resolve the underlying religious controversy. Community Church ended that controversy when it withdrew from UPCUSA and terminated its relationship with the Presbyterian denomination.

Mr. Justice Brennan in *Eldership* v. *Church of God at Sharpsburg, supra,* 396 U.S. at page 370 [24 L.Ed.2d at page 585]. What is meant by these expressions is nothing more than those principles or rules of law "developed for use in all property disputes" whether or not the litigants are religious associations or corporations. (See *Presbyterian Church* v. *Hull Church, supra; In re Metropolitan Baptist Church of Richmond, Inc., supra,* 48 Cal.App.3d at pp. 858-859.)

In their opening brief appellants make an argument designated III in which they appear to contend that, apart from the cited cases, a judgment confirming title of the disputed property in Community Church would violate the dictates of the First Amendment by interfering with the free exercise of religion as practiced by UPCUSA, its constituent organizations and their members, and would constitute an establishment of religion by preferring one religion, that espoused by Community Church, to another, that espoused by the adherents of UPCUSA. Of course, the courts of California, in ascertaining the parameters of state action permissible under the First Amendment applicable to the states through the Fourteenth, are bound by the authoritative interpretations of the First Amendment enunciated by the United States Supreme Court. As discussed earlier, the decisions of the United States Supreme Court have expressly indicated that the mandates of the First Amendment are not violated by civil court resolution of property disputes involving religious organizations so long as that resolution does not depend on the court's attempting to resolve ecclesiastical controversies. Moreover, appellants' arguments overlook a fundamental fact. Any judgment the court below might have rendered would have had some effect upon the free exercise of religion and could be interpreted to prefer one religion over another. Impressing a trust upon the property in the name and possession of Community Church in favor of plaintiffs would no less have interfered with the right of the Community Church congregation freely to exercise religion as plaintiffs claim the present judgment interferes with the right of UPCUSA's membership freely to exercise religion. A judgment in favor of plaintiffs in the court below would no less have preferred the religion of their congregants over that of the congregants of Community Church than the present judgment prefers the religion of the congregants of Community Church over that of plaintiffs. (See *Maryland and Virginia Eldership* v. *Church of God* (1969) 254 Md. 162 [254 A.2d 162, 170] [decision following remand from the U.S. Sup. Ct.]; app. dism. for want of a substantial federal question in *Eldership* v. *Church of God at Sharpsburg, supra,* 396 U.S. 367 [24 L.Ed.2d 582, 90 S.Ct. 499].)

■ We turn to appellants' contention that as a matter of law the property of a local church which is part of a general church having a hierarchical structure is held in trust for the general church. There is no question but that the properties of a religious, nonprofit corporation are held upon a trust. (*Lynch* v. *Spilman,* 67 Cal.2d 251, 260 [62 Cal.Rptr. 12, 431 P.2d 636]; *Committee of Missions* v. *Pacific Synod, supra,* 157 Cal. at p. 127; *Wheelock* v. *First Presb. Church, supra,* 119 Cal. at pp. 483-484; *Samoan Congregational etc. Church in U.S.* v. *Samoan Congregational etc.*

*Church of Oceanside, supra,* 66 Cal.App.3d at pp. 73-74; see *Horsman v. Allen, supra,* 129 Cal. at p. 136.) The present dispute concerns the uses for which the property is held, and the identity of the beneficiaries of the trust—the congregants of the local church, or the general church and/or, perhaps, its congregants.

For support of their contention that the general church and, perhaps, its congregants are as a matter of law the beneficiaries of the trust, appellants rely on language found in *Wheelock v. First Presb. Church, supra,* 119 Cal. at page 483, and *Watson v. Jones, supra,* 80 U.S. at page 720 [20 L.Ed. at page 673]. Analysis of the context in which the courts used the language relied on by appellants demonstrates that the language does not support appellants' contention and in fact supports the position of Community Church.

In *Wheelock,* quoting from *Winebrenner v. Colder,* 43 Pa.St. 249, the court said in part: " 'Whatever property stands in its name is seised to the use of the church proper. It is a trustee holding property for the use and enjoyment of the church, and every member of the church is a beneficiary of that trust.' " (119 Cal. at p. 483.) Appellants take the word "church" in the quoted language to refer to the general church as opposed to the local church. In this they are mistaken. The court in using this language was not discussing any problem involving the relationship between the general church and the local church; it was discussing the relationship between the local church's ecclesiastical body (i.e., the session) and the local church corporation or board of trustees in whom is vested title to the local church's property. (See 119 Cal. at pp. 482-483.) Thus it is clear that the word "church" and the words "member of the church" refer to the local church and a member thereof. In essence what the court was saying was that the directors or trustees of the corporation hold title to the property of the church in trust for the local church and every member thereof. Any doubt about the matter is resolved by the language of the next paragraph referring to the Central Presbyterian Church, one of the two churches into which the First Presbyterian Church of Los Angeles had been divided by the Presbytery. The court stated: "*Its members* were beneficiaries of the trust before the Presbytery divided the church and in justice and equity must stand in the same position after division." (119 Cal. at p. 483; italics added.) Continuing, the court said: "The Presbytery had power to divide the old church into two other and new churches. It is [*sic*] exercised that power. Such exercise simply *made two church beneficiaries instead of one.*" (119 Cal. at pp. 483-484; italics added.) The

two churches referred to were the two local churches into which the First Presbyterian Church of Los Angeles had been divided by the Presbytery. Thus, properly read, *Wheelock* stands for the proposition that the property of a local church, even one that is part of a general church organization of hierarchical structure, is held in trust by the religious nonprofit corporation for the benefit of the local church congregation.

While some of its language is ambiguous, the decision in *Committee of Missions* v. *Pacific Synod, supra,* 157 Cal. at pages 126-127, appears to be to the same effect. The trial court found "that the property consists of houses of worship held by the plaintiff corporation for the members of the local churches, respectively, which occupy and use the same." (157 Cal. at p. 127.) The Supreme Court apparently agreed, for it affirmed the judgment of the trial court and, in addition, earlier in the opinion stated: "It [the plaintiff corporation formed by Pacific Synod] has acquired and now holds various parcels of real property *in trust for the use of local congregations within the synod. . . .*" (157 Cal. at p. 110; italics added.) Further, in its reasoning the court relied upon the fact that "[e]ach particular church . . . established by the Cumberland Church, retains its individual and separate integrity and existence and *its property rights,* after the union as fully as before . . . ." (157 Cal. at p. 125; italics added.)

Some language used by the court in *Horsman* v. *Allen, supra,* 129 Cal. at page 136, indicates a similar conclusion by that court. Speaking of the tripartite classification made by the court in *Watson* v. *Jones,* the court said: "The first is where property, by the express terms of the grant, 'is devoted to the teaching, support, or spread of some specific form of religious doctrine or belief'; the second, where it is held by or in trust for an independent congregation; and the third, *where it is held by or in trust for a congregation or other association subordinate to some general church organization.*" (Italics added.)

The language from *Watson* v. *Jones* relied on by appellants is the court's statement: "The trustees obviously hold possession for the use of the persons who by the constitution, usages and laws of the Presbyterian body, are entitled to that use." (80 U.S. at p. 720 [20 L.Ed. at p. 673].) The language states a truism, but it leaves unanswered the vital question of the identity of the persons entitled to use of the property by the constitution, usages and laws of the Presbyterian body. We observe at once that the statement does not support appellants' contention that the determination to be made is one of law. The court's reference to usages of

the Presbyterian body suggests the question might well be one of fact. (Cf. *Rosicrucian Fellow.* v. *Rosicrucian etc. Ch.,* 39 Cal.2d 121, 133-135, 138 [245 P.2d 481].) Moreover, the language of the court immediately preceding and following the quoted statement clearly indicates that the word "trustees" in the quoted statement refers to the trustees of a local church and that the "persons" the court had in mind were the congregants of the local church. The significant language preceding the quoted statement is: ". . . [B]y the acknowledged rules of the Presbyterian Church, the trustees were the mere nominal title holders and custodians of the church property, and other trustees were, or could be elected *by the congregation,* to supply their places once in every two years. 2. That in the use of the property for all religious services or ecclesiastical purposes, the trustees were under the control of the church *session.* 3. That by the constitution of all Presbyterian churches, the *session,* which is the *governing body in each,* is composed of the ruling elders and pastor . . . ." (80 U.S. at p. 720 [20 L.Ed. at p. 673]; italics added.) Immediately following the statement relied on by appellants appears the following: "They are liable to removal by *the congregation for whom they hold this trust,* and others may be substituted in their places. They have no personal ownership or right beyond this, and are subject in their official relations to the property, to the control of the *session* of the Church." (80 U.S. at pp. 720-721 [20 L.Ed. at p. 673]; italics added.) The words "congregation" and "session" unmistakably indicate the reference is to the local church and the local church congregation.

Moreover, the effect of *Watson* v. *Jones* was the rejection or repudiation of the very doctrine that appellants appear to invoke—the implied trust doctrine holding that church property was the subject of an implied trust in favor of those who adhered to the faith of the founders of the church. (See *Watson* v. *Jones, supra,* 80 U.S. at pp. 727-729 [20 L.Ed. at pp. 676-677]; *Judicial Intervention in Church Property Disputes—Some Constitutional Considerations,* 74 Yale L.J. 1113, 1114 et seq.) A concomitant of this implied trust doctrine was the necessity for the court to examine in great detail questions of religious doctrine in its determination as to which group of claimed beneficiaries continued to adhere to the "true" faith and which had departed from the "true" doctrine. (See *Presbyterian Church* v. *Hull Church, supra,* 393 U.S. at pp. 449-450 [21 L.Ed.2d at p. 666]; *Maryland and Virginia Eldership* v. *Church of God, supra,* 254 A.2d at p. 165; *Presbyterian Ch. in U.S.* v. *Eastern Heights Pres. Ch.* (1969) 225 Ga. 259 [167 S.E.2d 658, 659] (decision on remand from the U.S. Sup. Ct. in *Presbyterian Church* v. *Hull Church, supra,* 393

U.S. 440 [21 L.Ed.2d 658, 89 S.Ct. 601]).) That is precisely what *Watson* v. *Jones* held a civil court is not permitted to do. (80 U.S. at pp. 733-734 [20 L.Ed. at p. 678]; see *Presbyterian Church* v. *Hull Church, supra*; *Maryland and Virginia Eldership* v. *Church of God, supra*; *Presbyterian Ch. in U.S.* v. *Eastern Heights Pres. Ch., supra*.) If the implied trust doctrine was ever the law in this state (cf. *Baker* v. *Ducker*, 79 Cal. 365, 373-374 [21 P. 764]), it appears to have been repudiated in *Rosicrucian Fellow.* v. *Rosicrucian etc. Ch., supra*, 39 Cal.2d at pages 133-134, where, in rejecting an argument based on adherence to the "original structure," the court stated: "The basic question in a controversy such as this should be the ownership of civil and property rights as shown by the conduct and acts of the parties. A classification based on a formula is not of much assistance. . . ."

Thus we find no support for appellants' contention in the decisional language relied on by them. On the contrary, the applicable decisions establish that the property of a religious nonprofit corporation is held upon a trust " 'to carry out the objects for which the organization was created.' " (*Lynch* v. *Spilman, supra*, 67 Cal.2d at p. 260; *Samoan Congregational etc. Church in U.S.* v. *Samoan Congregational etc. Church of Oceanside, supra*, 66 Cal.App.3d at p. 74; cf. *Wheelock* v. *First Presb. Church, supra*, 119 Cal. at pp. 483-484; *Baker* v. *Ducker, supra*, 79 Cal. at pp. 373-374.) Although the original articles of incorporation of Community Church recited that it was a "church organized under and adhering to the doctrines and discipline of the Presbyterian Church in the United States of America" and provided that the corporation "shall be at all times subject and adhere to the doctrines and discipline of the Presbyterian Church in the United States of America," its stated purpose was "the establishment and maintenance of a place or places for worship and instruction, and for the dissemination and spreading of the *Christian Doctrine* among the people of the world. . . ." (Italics added.)

Except for one argument separately set forth, the contentions of appellants which we interpret as claiming that the evidence establishes an express or implied-in-fact trust are so admixed with their contentions based on the First Amendment and the *Serbian Orthodox* and *Watson* v. *Jones* decisions that it is difficult to organize them for meaningful discussion. We address those of significance that we can isolate.

■ The separately stated argument is as follows: "The session of the Palm Springs church [Community Church] voted to withdraw from the

UPCUSA, and the session ceased to function as a judicatory of the UPCUSA at that time. This constituted an abandonment of the work of the UPCUSA in Palm Springs, and the members of the church at Palm Springs were dispersed, and therefore the church property is subject to such disposition as may be directed by the Presbytery of Riverside." To support these conclusions, appellants rely on a paragraph from The Book of Order which provides: "Whenever hereafter *a particular church* is formally dissolved by the presbytery, or has become extinct by reason of the dispersal of *its* members, the abandonment of *its* work, or other cause, such property as it may have, both real and personal, shall be held, used, and applied for such uses, purposes, and trusts as the presbytery may direct, limit, and appoint, or such property may be sold or disposed of as the presbytery may direct, in conformity with the Constitution of The United Presbyterian Church in the United States of America." (Italics added.)

These contentions of appellants are ill-founded. The quoted provision plainly provides that the property of a local church shall be held upon such trusts as the presbytery may direct when the local church (session) has been formally dissolved by the presbytery or when the local church has become extinct because of the dispersal of its members or the abandonment of its work. "[I]ts work" refers to the work of the local church, not the work of UPCUSA. As previously pointed out, the articles of incorporation of Community Church have provided since it was first incorporated that its purpose is the establishment of one or more places of worship and the dissemination of the Christian doctrine. Community Church still maintains a place of worship and is still engaged in the dissemination of Christian doctrine notwithstanding its withdrawal from the Presbyterian denomination. Its work has not been abandoned, and its members have not been dispersed.

█ In respect to what we have characterized as the implied-in-fact trust contention, appellants' principal argument is that UPCUSA has long adhered "to the principle that title to all property of the local church is held in trust for the benefit of the whole denomination," and that when Community Church affiliated with UPCUSA in 1917, it and its members agreed to be bound by the system of government and the laws and practices of UPCUSA. (See, e.g., *Watson* v. *Jones, supra,* 80 U.S. at pp. 726-727 [20 L.Ed. at p. 676]; *Committee of Missions* v. *Pacific Synod, supra,* 157 Cal. at p. 122.) Thus it is asserted that by implied agreement Community Church holds title and possession of its property subject to a trust for the benefit of the general church.

■ However, normally, the question whether parties in their dealings have created a trust is one of fact to be determined largely by ascertaining the intent of the parties (*Petherbridge v. Prudential Sav. & Loan Assn.,* 79 Cal.App.3d 509, 516-517 [145 Cal.Rptr. 87]; *Abrams v. Crocker-Citizens Nat. Bank,* 41 Cal.App.3d 55, 59-61 [114 Cal.Rptr. 913]; cf. *Rosicrucian Fellow. v. Rosicrucian etc. Ch., supra,* 39 Cal.2d at pp. 133-138) measured by an objective standard (see *Petherbridge v. Prudential Sav. & Loan Assn., supra,* 79 Cal.App.3d at p. 516, fn. 2; *McGhee v. Bank of America,* 60 Cal.App.3d 442, 448 [131 Cal.Rptr. 482]; Rest.2d Trusts, § 23, com. a, p. 66). Where, as here, the trial court's determination of fact is based on conflicting evidence, or at least evidence giving rise to conflicting inferences, the substantial evidence rule applies, and the trial court's determination will not be disturbed on appeal. (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689]; *Petherbridge v. Prudential Sav. & Loan Assn., supra,* 79 Cal.App.3d at p. 517.)

■ It is undisputed, of course, that Community Church has title to and possession of all of the property in dispute, both real and personal. Community Church first acquired real property in 1918, at which time the grantors gave the property to named grantees in trust for a component of UPCUSA. In 1929 the property was re-deeded to the corporate Presbytery upon condition that should the land and buildings be used other than for religious purposes or should Presbytery "or other Protestant denomination" fail to "support and maintain the said church and the work therein, to a reasonable extent, the property . . . conveyed . . . and the title thereto" would revert to the grantor. In 1935 the original church property was sold and the proceeds of sale were used to acquire the land now owned and to build structures and add improvements. Provisions within The Book of Order require that in states where the incorporation of religious organizations is permitted, the property of the local church is to be held for the church by such corporation. In 1935 Community Church was not yet incorporated, and title to the newly acquired property was conveyed directly to the corporate Presbytery. After Community Church had been incorporated, at the request of Community Church, Presbytery conveyed the real property to Community Church in fee simple absolute with no restrictions, conditions or reservations relating to any trust. Previously, as required by Presbytery, Community Church's articles of incorporation were amended to add a provision that "upon the liquidation, dissolution or abandonment of said corporation," all property of the corporation would "revert, transfer and inure to the benefit of" UPCUSA.

Provisions in The Book of Order require that a local church must obtain permission from its presbytery before selling, leasing, mortgaging or otherwise encumbering any of its real property. However, unlike some other religious denominations having a hierarchical structure, there is no requirement by UPCUSA that title to local church property be vested in the general church. On the contrary, it is specifically provided that title to and administration of local church properties be vested in the local church trustees or corporation.

While there was evidence that some judicatories of UPCUSA asserted the principle that local church property is held in trust for the general church, there is not now, nor has there ever been a provision in The Book of Order so declaring, and in 1930 when the General Assembly considered a proposal for the amendment of UPCUSA's constitution to require that articles of incorporation of a local church declare that its property is held in trust for the general church, the proposal was not adopted.

Manifestly, the foregoing evidence gives rise to conflicting inferences. Even those provisions in The Book of Order that at first blush might be taken to support appellants' position (presbytery's permission required to sell, lease or encumber local church property; property to inure to the benefit of UPCUSA in the event of abandonment or dissolution of the local church) give rise to conflicting inferences, for if the property of a local church were in fact held in trust for the general church, those provisions would appear to be unnecessary. In any event, the controlling findings of the court with respect to the establishment of an implied-in-fact trust, which are not challenged on appeal, are that Community Church had no notice or knowledge that Presbytery or the general church claimed any implied trust interest in the local church properties; that at no time prior to the dispute between Community Church and UPCUSA and its components was any communication ever directed to representatives of Community Church giving notice that the general church claimed ownership of or a trust interest in Community Church properties; and that at no time did Community Church or its representatives make a commitment or agreement in writing or otherwise that title to its properties would be held in trust for the Presbyterian denomination or any division thereof. These findings are determinative of the issue.

■ Finally, we come to appellants' contention that the judgment quieting title to the disputed property in Community Church deprives the general church of its property without due process of law. This contention

is devoid of merit. The parties to this action, like countless others, are involved in a dispute over title to and the right to possession of specific real and personal property. Authoritative decisions of the United States Supreme Court and the appellate courts of the State of California authorize the trial court to determine the dispute by the application of "neutral principles of law" and the "formal title doctrine" (see fn. 2, and accompanying text, *ante*), that is, by the rules and principles of law applied to all parties to civil litigation involving such a dispute. Utilizing "neutral principles," the court has resolved the dispute adversely to plaintiffs, and, in a sense, plaintiffs have been "deprived" of property claimed by them. However, the "deprivation" of property plaintiffs have suffered is no different than that of any other unsuccessful litigant involved in such a dispute, and that "deprivation" is not without due process of law but on the contrary, is the result of due process of law.

The judgment is affirmed.

Tamura, Acting P. J., and McDaniel, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 10, 1979. Newman, J., was of the opinion that the petition should be granted.